NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1642                                        Appeals Court

        GEORGE EVANS vs. MAYER TREE SERVICE, INC., & others.[1]


                          No. 14-P-1642.

        Worcester.      September 9, 2015. - March 3, 2016.

            Present:  Meade, Wolohojian, & Milkey, JJ.


Practice, Civil, Summary judgment, Relief from judgment.
    Commissioner of the Department of Conservation &
    Recreation.  Trespass.  Real Property, Trespass, Removal of
    timber.  Nuisance.  Consumer Protection Act, Insurance,
    Unfair act or practice.  Insurance, Unfair act or practice.



    Civil action commenced in the Superior Court Department on
January 31, 2011.

    The case was heard by Daniel M. Wrenn, J., on motions for
summary judgment, and a motion for relief from judgment was also
heard by him.


    E. Douglas Sederholm for the plaintiff.
    Denise M. Tremblay for Mayer Tree Service, Inc.
    James T. Scomby for Marquis Tree Services, Inc.
    Elizabeth W. Morse for Farm Family Casualty Insurance
Company.


────────────────

    [1] Marquis Tree Services, Inc., and Farm Family Casualty
Insurance Company.

MILKEY, J.  In August of 2008, an invasive, wood-boring insect known as the Asian longhorned beetle (ALH beetle) was discovered in the Worcester area.  The ALH beetle infests particular types of hardwood trees (host trees) that die as a result.  Federal and State officials mobilized quickly to address the problem.  Under the plans that they jointly developed and implemented, host trees that showed tell-tale signs of infestation were to be destroyed, together with those additional host trees that were deemed to be at high risk of infestation.  The actual tree removal work was to be done by State contractors (and their subcontractors).

The plaintiff, George Evans, owns property at 14 Randolph Road in Worcester, where he lives with his wife.  There were numerous host trees at his property, including Norway maples. It is uncontested that in February of 2009, defendant Marquis Tree Services, Inc. (Marquis),[2] entered Evans's property and destroyed at least twenty-one Norway maples there at the specific direction of a Federal field inspector who mistakenly believed that Evans had given written permission to have all host trees on his property destroyed.

The principal question before us is whether, under the particular circumstances presented, Marquis can be liable

---

[2] Marquis, the entity that cut Evans's trees, was a subcontractor of defendant Mayer Tree Service, Inc.

pursuant to G. L. c. 242, § 7, for destroying Evans's trees "without license" to do so. On cross motions for summary judgment, a Superior Court judge ruled in the defendants' favor in a detailed and thoughtful decision. Because we conclude that material facts remain in dispute that preclude entry of judgment as a matter of law, we vacate the judgment.

Background. 1. The Legislative response to the ALH beetle. According to documents in the record, the ALH beetle has the potential to devastate forestry and related industries if it is not contained. By emergency statute enacted on January 13, 2009, the Legislature declared the ALH beetle to be a public nuisance, and it provided the Department of Conservation and Recreation (DCR) broad authority to address the problem. See St. 2008, c. 493, § 1, amending G. L. c. 132, § 11. This included authority to "enter upon any land . . . for the purpose of determining the existence, over-all area and degree of infestation or infection caused by the public nuisances named in section eleven [including ALH beetles, and] suppressing and controlling said public nuisances." G. L. c. 132, § 8, as amended through St. 1956, c. 657, § 2. The statute also gave DCR general authority to "make use of and require the use of all

lawful means of suppressing such public nuisances."  G. L.
c. 132, § 11.[3]

2.  DCR general orders.  On August 8, 2008, that is, even
before the Legislature declared the ALH beetle to be a public
nuisance, DCR issued a general order addressing its plans to
eradicate the ALH beetle from Massachusetts.  That order applied
to a specifically designated area of central Massachusetts
referred to as "the Affected Area."  In addition to strictly
regulating the transport of firewood and certain other materials
from host trees inside the Affected Area, the order stated that

> "DCR may authorize, under separate agreements, DCR's duly
> authorized agents or designees . . . to enter upon the
> Affected Area and undertake activities necessary for
> suppressing, controlling and eradicating [the ALH beetle],
> including removing or causing to be removed, and the
> destruction thereof, all Regulated Articles,[4] within the
> Affected Area that are, may be or have the potential to be
> infested or infected by [the ALH beetle]."

The order went on to state that "[w]hile DCR seeks to implement
this Order to ensure eradication of [the ALH beetle], DCR plans

---

[3] In the nuisance abatement context, the Legislature
sometimes has spelled out what procedural protections apply
before private property is destroyed.  For example, the
statutory program designed to fight Dutch Elm disease specifies
that officials are to issue individual tree removal orders that
property owners can appeal or face the consequences.  See G. L.
c. 132, §§ 26F, 26G.  With regard to the ALH beetle, the
Legislature did not specify how ALH beetle eradication efforts
should be implemented but, instead, left all program design
issues to DCR.

[4] "Regulated articles" was defined by reference to host
trees to include "material living, dead, cut or fallen."

to do so in a reasonable manner, to the extent possible, to minimize impacts to private property."  Amended orders were issued from time to time in order to expand the geographical scope of the Affected Area.[5]

3.  <u>Tree marking and removal protocols</u>.  Working in partnership with the Animal and Plant Health Inspection Service (APHIS) within the United States Department of Agriculture (USDA), DCR developed protocols through which the agencies would pursue their eradication goals.  The first step in the process was to survey trees in areas known or suspected to be infested to look for outward signs of infestation, such as "an exit hole or an egg-laying site on [the tree] or an actual live beetle." Trees that revealed such signs were marked with red paint.  Host trees that did not show signs of infestation were marked with blue paint.  Thus, host trees marked with red paint (hereinafter, red-marked trees) were known to be infested, while host trees marked with blue paint (hereinafter, blue-marked trees) were not.  Blue-marked trees were at risk of becoming infested, especially to the extent they were in proximity to where infestation had been found.[6]

---

[5] There was a separate Federal order released, but that order dealt only with quarantine issues.

[6] A blue-marked tree already might be infested but not show outward signs of infestation.  For this reason, we will avoid referring to blue-marked trees as "uninfested trees."  In

From the beginning of the ALH beetle eradication program, red-marked trees were slated for destruction, specifically, through their being cut down and then chipped into small pieces. The fate of individual blue-marked trees depended on the particular degree of risk they posed.  It appears that some blue-marked trees could be treated with chemicals while others presented such unacceptably high risks that they would have to be destroyed.[7]  As discussed below, a DCR official provided deposition testimony that all host trees would have to be removed in a particular area of dense infestation.

4. Individual tree removal orders.  In consultation with APHIS, DCR developed standard forms that would be sent to individual property owners in the event that trees "on or near the[ir] premises" were found to be infested.  One form, labeled a "tree removal" order, notified the owner that "[t]he . . . trees that have been previously marked with red paint (indicating an infested tree) on the above-referenced Premises are to be cut, removed and destroyed."  With regard to blue-

_____

addition, we will avoid referring to them as "host trees" (a shorthand used by many of the underlying documents) because both red-marked trees and blue-marked trees are host trees.

[7] Thus, for example, the "cooperative agreement" that APHIS and DCR signed on December 22, 2008, notes that blue-marked trees are to be chemically treated "to protect [them] from infestation," while also stating -- without further specificity -- that "certain high risk" blue-marked trees would have to be destroyed.

marked trees, the individual orders stated that such trees "may need to be removed and destroyed [and that] [i]f such a determination is made by USDA or DCR, notice will be provided in advance that such additional hardwood trees are subject to this Order."

The individual tree removal orders also warned property owners that "[f]ailure to permit authorized contractors to perform the removal actions at the Premises, and any failure to otherwise comply with this Order, will result in the DCR seeking enforcement of this Order in Superior Court."  By statute,

> "[w]hoever knowingly resists or obstructs the [DCR] commissioner, any local superintendent or employee or authorized agent of any of them, while any of those persons is engaged in suppressing or eradicating the Asian longhorned beetle . . . shall be subject to a civil penalty of not more than $25,000 for each violation."

G. L. c. 132, § 12, as amended through St. 2008, c. 493, § 2.

5. Permission forms.  When DCR mailed individual tree removal orders to property owners, it enclosed a separate "acknowledgement and permission" form for property owners to sign.  Property owners signing that form would thereby be acknowledging that they had received the tree removal order and that they were granting permission to have trees "previously marked with red paint" destroyed.[8]  The form specifically

---

[8] Under an alternative version of that document in the record, property owners were asked to permit the destruction of "the hardwood trees that are the subject of the Removal Order,"

informed property owners that blue-marked trees "are not required to be cut and removed at this time." However, property owners also were told they could opt to have their blue-marked trees cut, without cost to them. Thus, property owners were presented with three options: (1) they could give permission to have only red-marked trees on their property cut, (2) they could give permission to have both red-marked and blue-marked trees there cut, or (3) they could decline to sign the form (signifying that they had not given permission for the removal of any trees).

In the event that a property owner refused to sign the permission form, DCR escalated its efforts to persuade the owner to do so, and if necessary, DCR referred the matter to the Attorney General for enforcement. At least on the record before us, there were only two occasions where DCR had to refer the matter to the Attorney General (both involving red-marked trees). In both cases, DCR ultimately was able to obtain the owner's permission without the need for a court order.

6. Mapping of property owner consent. The relevant officials used various geographic information system maps to

_____

without attention to whether the trees were marked in red or blue. Internal government records from December of 2008 indicate a perceived need to modify the language of the standard permission form so that property owners could expressly grant permission to have blue-marked trees removed. This indicates that the alternative version was an earlier one.

track the extent to which property owners had permitted the removal of host trees from their property. The properties for which owners had given permission to have only red-marked trees cut were shown in red (or pink), those who had given permission to have all marked host trees cut were shown in blue, and those who had not given permission were marked in white.

7. <u>The contracts</u>. DCR solicited bids for private contractors to do the actual tree removal work.[9] Through that process, DCR awarded a bid to defendant Mayer Tree Service, Inc. (Mayer), who in turn awarded a subcontract to Marquis with DCR's approval. It is uncontested that the bid specifications were incorporated into Mayer's contractual obligations with DCR, as set forth in the "notice to proceed." It is also uncontested that Marquis agreed to abide by those contractual obligations in its subcontract with Mayer.

The bid specifications to which Mayer and Marquis agreed required Mayer to "ensure that it performs its work in such a manner to ensure no damage to private and personal property contiguous to tree cutting activities, including those public and private trees designated to remain." Under the bid

---

[9] The contracts were funded by USDA, but DCR was the only government party to the contract. The defendants seek to rely on DCR's statutory authority to destroy host trees, and they have not invoked or briefed any independent authority that USDA might have had in this regard.

specifications, Mayer was prohibited from entering private property if it was not "in receipt" of written permission.[10] Where a private party had given such written permission for Mayer to enter, Mayer agreed to hold that property owner harmless for any contractual breaches by it and for any negligent acts by it or its officers, employees, agents, or subcontractors. Mayer was also required to carry significant amounts of comprehensive general liability insurance coverage for potential third-party personal injury and property damage claims.

8. <u>The cutting of Evans's trees</u>. Various tree surveys were conducted of Evans's property in 2008, including through the use of United States Forestry Service employees known as "smoke jumpers" who climbed the trees. A total of thirty-six host trees were discovered there, including twenty-five Norway maples, nine Japanese maples, an American elm, and a white ash. At least prior to February 9, 2009 (the first date that Evans alleges trees were cut on his property), no infested trees had been found there, and therefore none of Evans's trees had been marked in red. Ten of the thirty-six host trees, all Norway

---

[10] The relevant provision stated that "[t]he Contractor shall not enter any private property unless [it] is in receipt of a Permission Slip from the property owner substantially in the same form as Exhibit C prior to the Contractor during [<u>sic</u>] any tree removals." Neither the defendants nor DCR produced a copy of the permission form referenced as "Exhibit C," and that form is therefore not before us.

maples, were marked with blue paint as a result of the 2008 inspections. No explanation appears in the record as to why the other host trees were not marked in blue at that time.

It is undisputed that Evans never signed a written permission form permitting the cutting of any trees on his property. Nevertheless, Crystal Franciosi, the USDA inspector who was overseeing tree removal that day, mistakenly believed that Evans had granted permission to cut all host trees there.[11] Franciosi directed Marquis to enter Evans's property on February 10 and 11, 2009, and to destroy twenty-one Norway maples there.[12] Ten days after his trees were cut, Evans received a removal notice and order in the mail, together with the permission form.[13] These documents apprised Evans that he had the option of

------

[11] Because Evans had not signed a permission form, his property should have been shown in white on the map that tracked property owner permission. APHIS investigators appear to have concluded that Evans's property was accurately shown in white on the map, despite Franciosi's initial claims that it was marked in blue. In any event, at least for present purposes, it matters not whether Franciosi erroneously read a correctly marked map, or correctly read an erroneous one.

[12] On February 9, 2009, Marquis was cutting host trees on property owned by the Nazarene Church that abuts Evans's land. Evans claims that four of the Norway maples that were destroyed that day were actually on his land. However, there is nothing in the summary judgment record (save Evans's unsubstantiated assertions) that four trees cut on February 9, 2009, were on his side of the property boundary, nor have the defendants admitted this fact.

[13] Curiously, the order that Evans received was dated December 10, 2008, even though the postmark on the envelope

not having blue-marked trees removed at this time, and that such trees would be removed only if he so desired.

9. <u>APHIS investigation</u>. After Evans complained about the destruction of his trees, Christine Markham, the director for APHIS's national ALH beetle eradication program, looked into the matter. Her review confirmed that Evans had never granted written permission to have his trees destroyed. She also personally apologized to him both privately and publicly. In her words, the apology was for "the mistake made by USDA in the removal of his host trees."[14]

10. <u>Total host removal area</u>. In the course of discovery, Evans deposed Kenneth Gooch, a DCR official. According to Gooch's testimony, government officials had decided that in a two and one-half square mile area that included Evans's property, actual infestation was so widespread that all host trees in that area would have to be removed, regardless of whether they showed current signs of infestation, and regardless of whether property owners were willing to give their permission. For convenience, we will refer to such an area by

indicates that it was mailed on February 20, 2009. The defendants have not asserted that the order was received by Evans before his trees were cut.

[14] In addition to Markham's review, APHIS also conducted a formal investigation, which culminated in a report dated March 23, 2009. That report's conclusions are consistent with those reached by Markham.

the same name used by the motion judge, the "total host removal area."

11. The summary judgment record. On July 30, 2012, Evans served on the defendants a motion for partial summary judgment as to liability, supported by his verified complaint and a separate affidavit. With discovery not having been completed, the defendants obtained a stay of their obligation to respond to Evans's motion. After discovery had been completed, the defendants served their own summary judgment motions, with Mayer filing the lead motion. Although Evans's motion was first in time, the defendants did not treat their own motions as cross motions to the one Evans had already served, despite Evans's protests. Instead, they began the process of creating a second summary judgment record, while separately responding to Evans's motion.[15]

In their own statement of undisputed material facts, the defendants averred, based on Gooch's deposition testimony, that State and Federal officials had established a total host removal area and that Evans's property fell within it. Evans disputed both points in his written response to the defendants' statement of material facts, which he served on the defendants. He also

---

[15] Pursuant to Superior Court Rule 9A(b)(5)(v), there should be a single consolidated statement of material facts even where there are cross motions for summary judgment.

attached a second affidavit and various other documents in support of his responses. Notwithstanding this, because of a pointed dispute that the attorneys had over "service in electronic form by email," see Superior Court Rule 9A(b)(5)(i), the defendants did not include Evans's response to the statement of material facts (including his additional supporting materials) in the summary judgment package that they filed pursuant to Superior Court Rule 9A (rule 9A).[16] As a result, nothing in the rule 9A package alerted the motion judge to the fact that Evans was purporting to contest the existence and location of any total host removal area.

12. <u>Summary judgment ruling</u>. In his summary judgment decision, the judge ruled that based on the "undisputed facts

---

[16] Counsel for Mayer took the position that she had no duty to include Evans's response in the rule 9A package, because Evans's counsel refused to provide her with an electronic version of his documents (based on his view that rule 9A did not require him to do so under the particular circumstances presented). After the dispute between the lawyers about how rule 9A should be interpreted became particularly unseemly, counsel for Mayer went ahead and filed her rule 9A package without either including Evans's response or noting its absence. She did simultaneously file a separate "emergency" motion seeking an order compelling Evans to serve an electronic version of his new summary judgment documents, and in that manner sought to raise the merits of the rule 9A dispute for judicial resolution. However, after that motion was summarily denied (on the basis that there was no "emergency"), Mayer's counsel dropped her efforts to have the rule 9A dispute resolved and let the existing rule 9A package stand. When the motion for summary judgment eventually went forward, Evans's counsel apparently failed to notice that the documents he had served on the defendants by hard copy had never been put before the judge.

. . . Marquis had license to remove the trees in question from the Property, and thus, the Defendants are not liable as a matter of law under the trespass to trees statute [G. L. c. 242, § 7]."  According to the judge, "[i]t is irrelevant that the DCR sought to obtain permission from property owners, [because] it was not legally required to do so[;] [i]t is clear that the DCR had the authority to enter onto the Property and remove the trees in question, regardless of whether Evans gave permission."  The judge also accepted as undisputed that Evans's property was located in a total host removal area, and he relied on this fact in part in his ruling, commenting that this helped show that DCR had "specifically sanctioned the removal of the trees in question."

13.  Rule 60(b) motion.  After judgment had entered, Evans hired new counsel who filed a motion seeking relief from judgment pursuant to Mass.R.Civ.P. 60(b), 365 Mass. 828 (1974).  That motion asserted inter alia that Mayer's lawyer had committed a fraud on the court by not including Evans's response in the rule 9A package.  It also asserted that the failure by Evans's former counsel to raise the issue sooner constituted "excusable neglect."  The same judge who allowed the defendants' motions for summary judgment denied the rule 60(b) motion.  He ruled that Evans could not reopen the proceedings and add the additional materials to the summary judgment record, because he

had not met the standards applicable to rule 60(b) motions.[17]  He

added that, in any event, Evans's claims failed as a matter of

law regardless of whether his property fell within any total

host removal area.  In the judge's words,

> "even if Evans'[s] trees were not technically in the 'Total
> Host Removal Area,' it does not change the fact that -- as
> Evans concedes -- Evans'[s] trees were 'host' trees and
> that Marquis cut Evans'[s] trees after receiving
> instructions to do so from a USDA representative . . .
> facts [that,] alone, are sufficient to show that Marquis
> . . . had a 'license' i.e., permission, to cut the trees
> down."

Evans filed timely appeals of both the judgment and the denial

of his rule 60(b) motion.

Discussion.  1.  Marquis's liability.  Evans principally

sought damages against Mayer and Marquis pursuant to G. L. c.

242, § 7.[18]  That section reads in full as follows:

> "A person who without license willfully cuts down, carries
> away, girdles or otherwise destroys trees, timber, wood or
> underwood on the land of another shall be liable to the
> owner in tort for three times the amount of the damages
> assessed therefor; but if it is found that the defendant

---

[17] Although the judge concluded that Evans should have
served an electronic version of his response to Mayer's
statement of material facts, the judge did not rely on the
provision in rule 9A(b)(5)(ii) that states that "[f]or purposes
of summary judgment, the moving party's statement of a material
fact shall be deemed to have been admitted unless controverted
as set forth in this paragraph."  Instead, he focused on whether
the record should be expanded to include Evans's additional
materials and whether this would have made any difference.

[18] Evans also filed claims against Mayer, Marquis, and their
insurer, defendant Farm Family Casualty Insurance Company, based
on the failure by all of them to remedy the damage to Evans's
trees.

had good reason to believe that the land on which the trespass was committed was his own or that he was otherwise lawfully authorized to do the acts complained of, he shall be liable for single damages only."

Before we turn to the statute's application to this case, a few general observations about its workings are in order. The statute provides a tort remedy through which property owners can seek damages from "person[s]" who cut down or otherwise destroyed their trees "without license." So long as the act of cutting was intentional and the act was without license, liability exists -- albeit for single damages only -- even where the person cutting the trees had "good reason to believe" he was "lawfully authorized" to do so. See Moskow v. Smith, 318 Mass. 76, 77-78 (1945). Thus, liability is not based on fault. A tree cutter faces no liability under the statute only where he had actual "license" to cut the trees, which the statute equates with being "lawfully authorized" to do so.

The statute dates at least as far back as a Province Law of 1698. See Province Laws 1698, c. 7, § 2. As originally enacted, it appears aimed at the problem of people stealing wood from other owners or from the public commons.[19] However, the

_____

[19] Owners deprived of their wood were entitled to recover "twenty shillings for every tree of one foot over, and ten shillings for every tree under that bigness, and for other wood or underwood treble the value thereof." Province Laws 1698, c. 7, § 2. The applicable damages and the availability of other sanctions changed from time to time until 1836, when the statute

statute's language is not limited to that context.  Thus, the language does not speak of the stealing of trees but instead applies broadly to anyone who without license "cuts down, carries away, girdles or otherwise destroys trees" owned by others.  We therefore have recognized that the statute applies where someone cut down trees not to appropriate their wood, but solely to improve his view.  Glavin v. Eckman, 71 Mass. App. Ct. 313, 316-317 (2008).  We also have recognized that the damages available under the statute are not capped at the timber value of the wood.  Id. at 317-318.

In the case before us, the trees were cut incident to a nuisance eradication program.  Because property may not be used to maintain a public nuisance, States may destroy private property without compensation if necessary to abate such a nuisance.  Mugler v. Kansas, 123 U.S. 623, 668-669 (1887).[20]  It

---

essentially took its current form (subject only to very minor changes since).  See R.S. (1836), c. 105, §§ 10, 11.

[20] This principle has long been applied to the destruction of infested or infected trees that may spread a pestilence to other trees.  See Miller v. Schoene, 276 U.S. 272, 279-280 (1928).  Of course, even when governments have been broadly authorized to eradicate nuisances, there may be constitutional limitations on their unfettered destruction of private property. For example, one court has held that as a matter of due process, a State agency that was broadly authorized to eradicate a pest that attacked citrus trees (the burrowing nematode) must first give grove owners a predeprivation hearing (even though the statute provided an after-the-fact compensation scheme with regard to uninfested trees that were destroyed in the process).

follows that a contractor who had been duly authorized to destroy privately owned trees as part of a statutory nuisance eradication program would have "license" to do so, and therefore could not be liable pursuant to G. L. c. 242, § 7.[21] Compare Blair v. Forehand, 100 Mass. 136, 144-145 (1868) (owners of unlicensed and uncollared dogs had no action for trespass or trover against town constable who acted within his express statutory authority in killing the dogs).

It is uncontested that Marquis destroyed Evans's trees at the specific instruction of the government official who was overseeing field operations that implemented a program broadly authorized by the Legislature to eradicate the ALH beetles. Concluding in effect that this necessarily meant that Marquis was acting with "license," the judge ruled that Evans's action failed as a matter of law. The flaw in this reasoning is that it does not account for the possibility that the agency instructions pursuant to which Marquis cut the trees were invalid and the trees were simply cut by mistake. See Tower v.

---

State Plant Board v. Smith, 110 So. 2d 401, 407-409 (Fla. 1959). Evans has not raised any constitutional claims.

[21] For purposes of its summary judgment motion, Marquis focused on its argument that it had license to cut the trees because it was acting pursuant to delegated governmental authority. It did not press its alternative theory that Evans's being present at the site during the cutting without voicing an objection amounted to license. A factual dispute over this alternative theory remains.

Tower, 18 Pick. 262, 263 (1836) (because Legislature had authorized summary killing of unlicensed, uncollared dogs, tort action would not lie against defendant-neighbor except where collared dogs were killed by mistake).

As Evans points out, DCR created a program under which it would provide property owners specific notice of its planned eradication actions. Whether and when privately owned trees were actually destroyed then turned on the landowner's providing written permission.[22] Although DCR reserved the right to seek a court order in the event that a property owner refused consent, no host trees otherwise were to be destroyed absent that consent. The question is whether, in creating its protocols, DCR thereby limited its broad authority to cut trees without a property owner's permission. In our view, that question should not be answered based on the current summary judgment record.

The protocols that DCR developed were not the product of formally promulgated regulations carrying the force of law. See generally Global NAPs, Inc. v. Awiszus, 457 Mass. 489, 496 (2010). As a general matter, unpromulgated guidelines setting forth internal agency procedures are not considered binding on an agency. Id. at 496 n.11. See Golchin v. Liberty Mutual Ins.

_____

[22] DCR explained that designing the program in this manner expedited the eradication process by avoiding legal disputes between DCR and property owners. The fact that protecting property owner rights simultaneously may have furthered the agency's eradication efforts is of no legal moment.

Co., 460 Mass. 222, 231 (2011) ("Where the commissioner does not consider bulletins to be binding regulations, we are not inclined to hold otherwise"). However, the case law also recognizes that in certain contexts, agency pronouncements can be binding on the agency even where they have not formally been promulgated as regulations. See Macioci v. Commissioner of Rev., 386 Mass. 752, 763 (1982) (Commissioner of Revenue had duty to conform to guidelines issued to public). The cases have distinguished between guidelines that "concern[] only internal management of State agencies" and those designed to "affect the rights of or procedures available to the public." Amato v. District Attorney for the Cape & Islands Dist., 80 Mass. App. Ct. 230, 238 n.15 (2011), citing G. L. c. 30A, § 1(5) (Administrative Procedure Act codifying this distinction). See Global NAPs, Inc., supra at 496 n.11. Where an agency has published guidelines on how it is going to proceed and has implicitly invited affected members of the public to rely on them, such guidelines can be deemed to constrain the agency's actions.

The summary judgment record before us is not well developed on whether DCR's policy of obtaining property owners' written consent should be treated as the sort of pronouncement that constrains agency action. For example, there is little in the record indicating the extent to which that policy was published

to affected members of the public.  At the same time, there are some indications in the record, such as Markham's public acknowledgement that Evans's trees were cut by "mistake," that suggest that the agencies may have intended that members of the public rely on the policy.  Another factor lending potential support to Evans's position is that the contractual arrangements under which Mayer and Marquis nominally were operating prohibited them from entering private property without an owner's written permission and otherwise included provisions designed to protect property owner rights.[23]  In our view, determining whether DCR's authority to instruct Marquis to cut down Evans's trees was curtailed by its policies regarding written permission needs further factual development.

We recognize that Marquis's actions were specifically directed by Franciosi, a Federal employee.  This may well provide Marquis "good reason to believe" that it had authority to cut Evans's trees (thus shielding Marquis from treble

---

[23] We acknowledge that -- regardless of the nominal terms of the contracts under which Marquis was operating -- it appears undisputed that treecutters such as Marquis would not refuse to enter private property unless they had written permission in hand, but instead simply would follow the directives of the government field inspectors.  However, the existence of such an unexplained discrepancy, if anything, provides further support for not trying to resolve this case on the current summary judgment record.

damages).[24]  However, Franciosi's mistaken instructions could not

provide actual "license" to cut the trees if such instructions

were legally invalid.[25]

In reaching our conclusion, we have assumed, without

deciding, that the judge did not abuse his discretion in denying

the Mass.R.Civ.P. 60(b) motion.[26]  Thus, we have not relied on

those additional factual materials that Evans sought to include

in the summary judgment record, and we have assumed arguendo

that Evans's trees fell within a total host removal area.  That

Evans's trees may have been slated for eventual destruction

obviously has significant potential ramifications for the amount

---

[24] Neither side has briefed this issue, and we decline to reach it.  We express no opinion on whether this issue can be resolved as a matter of law or instead requires submittal to a jury.

[25] Burroughs v. Rane, 241 Mass. 1 (1922), is not to the contrary.  That case held that the State forester who -- acting pursuant to statutory authority -- had relied on "needy" persons to conduct a gypsy moth eradication program could not be liable in tort for tree damage caused by a fire that may have been started negligently.  Id. at 4-6.  The case does not address the potential liability of those who actually started the fire.

[26] Although we have no occasion to reach the merits of the rule 9A dispute that underlies the rule 60(b) motion, we do note that counsel on both sides did not clothe themselves in glory with regard to how those issues played out, and that their joint conduct unnecessarily placed the motion judge in an extremely difficult position.

of damages to which Evans might be entitled.[27]  The defendants might have prevailed on summary judgment if they had shown that Evans in no event could have kept his trees for an appreciable period of time had they not been cut by mistake.  However, on the current record, we cannot reasonably say that Evans has no hope of demonstrating that.  After all, the defendants have not presented a single other example of where any host tree was cut without an owner's permission, or even any example of where DCR ever sought a judicial order to take down a blue-marked tree against an owner's wishes.  We further note that Marquis did not destroy Evans's nine Japanese maples, American elm, and white ash, and from all that appears before us, those host trees remain today.  We leave the import of whether Evans's trees fell within a total host removal area to further proceedings.

2.  Mayer's liability.  It is uncontested that Marquis, not Mayer, actually cut Evans's trees.  However, it is also uncontested that when Marquis cut the trees, it was working as Mayer's subcontractor, and Evans has alleged that Mayer bears liability pursuant to G. L. c. 242, § 7, as Marquis's principal. See Corsetti v. Stone Co., 396 Mass. 1, 10-11 (1985) (contractor is subject to liability for torts of its subcontractor where it retains "sufficient control" over subcontractor's work).  On

---

[27] In other words, Evans's assumption that a finding of liability necessarily would mean that he is entitled to the full replacement value of his lost trees is flawed.

appeal, Mayer makes a passing argument that even if Marquis faces liability pursuant to the statute, Mayer itself does not because it did not in fact direct Marquis to destroy these particular trees (even though it had a contractual right to control Marquis's actions). That argument was not developed below, and the judge had no occasion to address it. Especially in light of the current state of the briefing, we decline to reach Mayer's argument that it could not derivatively be liable as a matter of law.[28]

3. <u>Liability of the insurer</u>. In count five of his complaint, Evans alleges that defendant Farm Family Casualty Insurance Company (Farm Family), which insured both Marquis and Mayer, faces its own liability pursuant to G. L. c. 93A, § 9(3), and G. L. c. 176D, § 3(9)(<u>f</u>). This count is based on the claim that Farm Family failed to make a reasonable offer of settlement after the liability of its insured parties had become reasonably clear. See <u>Van Dyke</u> v. <u>St. Paul Fire & Marine Ins. Co</u>., 388 Mass. 671, 677-678 (1983). Although we have concluded that at least Marquis faces potential liability pursuant to G. L. c. 242, § 7, that exposure has up until now not been reasonably clear, and it remains in significant doubt today. See <u>Clegg</u> v.

_____

[28] For similar reasons, we decline to address the viability of counts three and four of Evans's complaint, in which he alleges that Marquis and Mayer somehow face liability under G. L. c. 93A.

Butler, 424 Mass. 413, 421 (1997) (reasonably clear liability "encompasses both fault and damages").  As a result, count five as pleaded is, at a minimum, premature.[29]

4.  Disposition.  The judgment dismissing Evans's complaint is vacated.  In view of that disposition, the appeal from the order denying Evan's Mass.R.Civ.P. 60(b) motion has become moot, and we dismiss it as such.  The case is remanded to the Superior Court for further proceedings consistent with this opinion.[30]

So ordered.

---

[29] Farm Family argues that a different judge erred in denying its motion to dismiss challenging the adequacy of its c. 93A demand letter.  Given that we conclude that Evans to date has had no basis for asserting that Farm Family faced c. 176D liability, we need not reach the formal adequacy of such a letter.

[30] Although we have ruled in Farm Family's favor with regard to count five, the question of whether Farm Family would be entitled to separate and final judgment is not before us.  See Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974).