# United States Court of Appeals
## For the First Circuit

No. 16-2423

GEORGE EVANS,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee,

CRYSTAL FRANCIOSI, an Employee of the
Department of Agriculture, sued in her Individual Capacity;
UNITED STATES DEPARTMENT OF AGRICULTURE,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. David H. Hennessy, U.S. Magistrate Judge]

---

Before
Lynch and Selya, Circuit Judges,
and Levy, District Judge.*

---

Michael J. O'Neill and McGregor & Legere, P.C. on brief for appellant.
William D. Weinreb, Acting United States Attorney, and Shelbey D. Wright, Assistant United States Attorney, on brief for appellee.

---

December 4, 2017

---

*Of the District of Maine, sitting by designation.

SELYA, **Circuit Judge**.  In this case, a small bug incited a lawsuit under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680.  The district court, acting through a magistrate judge, ruled that the FTCA's discretionary function exception barred the maintenance of the action.  See Evans v. United States, No. 14-cv-40042, 2016 WL 5844473, at *8 (D. Mass. Sept. 30, 2016) (citing 28 U.S.C. § 2680(a)).  After careful consideration, we affirm.

**THE BEETLES**

We first rehearse the background of the case dividing our account into four movements.

## Norwegian Wood

The Asian Longhorned Beetle (ALB) is an invasive pest that arrived in the United States from Asia, concealed in wooden shipping crates and pallets.  According to the United States Department of Agriculture (USDA), the ALB has the grim potential to be "one of the most destructive and costly invasive species ever to enter the United States."  It bores into (and reproduces within) deciduous hardwood trees, such as maple, elm, ash, birch, poplar, and willow trees.  These trees, collectively called "host trees," are especially vulnerable to ALB infestation, which generally proves fatal to them.  Consequently, ALB infestation poses a severe threat not only to all host-tree species (ranging from shade trees to forest resources worth billions of dollars)

- 2 -

but also to a multitude of industries that depend on the availability of hardwood. As a result, the USDA has declared ALB infestation an emergency and has begun working with state and local governments to eradicate this pest before it causes lasting economic damage.

In 2008, ALB infestations were first detected in Massachusetts. That August, the Massachusetts Department of Conservation and Recreation (DCR) issued a quarantine order under its authority, see Mass. Gen. Laws ch. 132, §§ 8, 11, 12; Mass. Gen. Laws ch. 132A, § 1F, to suppress and control nuisance conditions and regulated articles (including living, dead, cut, or fallen host trees). The state quarantine area included much of the City of Worcester, and the state quarantine order authorized DCR to use all lawful means to suppress, control, and eradicate ALB infestation (including the removal of all trees that could become infested). The state quarantine order also authorized DCR to enter upon lands as might be necessary either to implement the order or to conduct activities thereunder. Finally, the quarantine order authorized DCR to invest a federal agency, the Animal and Plant Health Inspection Service (APHIS), with the same array of powers.[1]

---

[1] APHIS is a sub-agency within the USDA.

The following month (September of 2008), the USDA issued an order to include portions of Massachusetts within the sweep of preexisting federal ALB quarantine regulations. See 7 C.F.R. § 301.51—1-9. These regulations impose strict requirements on the interstate movement of any trees or wood products susceptible to ALB infestation. In January of 2009, this federal quarantine was expanded to include the Worcester area. See id. § 301.51—3.

**Come Together**

Toward the end of 2008, DCR entered into a cooperative agreement (the Agreement) with APHIS to jointly combat the ALB infestation. The Agreement created the ALB Cooperative Eradication Project (the Project), a partnership marshaling federal, state, and local resources and aimed at eradicating the ALB through, inter alia, host-tree removal. The stated goal of the Agreement was that "[a]ll infested and certain high risk host trees will be removed and destroyed in order to eradicate the ALB from Massachusetts." In furtherance of this goal, APHIS agreed to develop and deliver "an effective public relations program," to provide funds to DCR for host-tree removal contracts, and to furnish support personnel, equipment, and facilities.

With the Agreement in place, the Project began to tackle ALB infestation one tree at a time. Typically, Project staff would visually survey trees to determine if they were infested with ALB. Infested trees were marked with red paint, indicating that their

- 4 -

removal was obligatory.  Uninfested trees that belonged to a host species were marked with blue paint, indicating that their removal was encouraged (though not required).

DCR proceeded to write to property owners within the quarantine areas to inform them that, in consultation with APHIS, it had determined that it was necessary to take steps to eradicate ALB.  Its letter explained that "the hardwood trees that have previously been marked with red paint . . . are to be cut, removed, and destroyed," while "[a]dditional hardwood trees marked with blue paint . . . may need to be removed and destroyed."  The letter further advised property owners that if trees in this latter category were going to be cut down, "notice will be provided in advance."  Along with each letter, DCR mailed a form, which gave property owners an option: "the undersigned ___DOES/___DOES NOT request and authorize host trees to be cut and removed from the premises and destroyed."  The form also requested a property owner's signature to authorize DCR's contractors to cut, remove, or destroy any trees.  The property owner was advised that, even if he did not consent, "failure to permit authorized contractors to perform the removal actions at the premises . . . will result in DCR seeking enforcement of this Order in Superior Court."

The Project maintained maps and charts indicating which property owners had authorized all host-tree removal, which had authorized only the removal of infested trees, and which had not

yet signed and returned the form. Ordinarily, an APHIS representative would go into the field with the tree-removal contractors hired by DCR and point out which trees they should cut. Standard practice was that the APHIS representative would not instruct a contractor to enter a parcel of land unless the Project's records indicated that the owner had authorized such an entry.

## Here Comes the Sun

Against this backdrop, we turn to the facts giving rise to the underlying claim. Plaintiff-appellant George Evans owns an interest in property in Worcester,[2] within both the state and federal quarantine areas. The appellant's half-acre parcel is located within a 2.2 square-mile area identified as the epicenter of the ALB infestation and specially targeted for removal of high-risk host trees. A survey conducted on December 8, 2008, disclosed that no fewer than thirty-six shade trees on the appellant's property were host species (although not then infested). Approximately ten of these trees were daubed with blue paint. Neither the appellant nor his wife authorized contractors to enter onto their property for the purpose of tree removal, and Evans claims — and the government does not dispute — that he did not

---

[2] The appellant's wife, Katherine Evans, is a joint owner of the property. She has not proffered a claim against the government, though, and she is not a party to this appeal.

receive the letter and authorization form from DCR until after his trees had been cut down.

In mid-February of 2009, contractors nonetheless entered the appellant's property and cut down twenty-five maple trees. Crystal Franciosi, an APHIS technician, stated that no fewer than twenty-one of these trees were infested with ALB.[3]

## The Long and Winding Road

The appellant filed an administrative claim with USDA, alleging that twenty-five of his shade trees had been chopped down without his permission. The USDA rejected this claim on January 26, 2012. The appellant countered by instituting this FTCA action.[4] The parties consented to proceed before a magistrate judge, see 28 U.S.C. § 636(c); Fed. R. Civ. P. 72, and engaged in extensive pretrial discovery. At the close of discovery, the

---

[3] Franciosi thought that her map showed the property owners had given permission for the removal of all host trees. A subsequent investigation found no record that any such permission had been granted. For summary judgment purposes, we assume, favorably to the appellant, that the trees were cut down without his prior authorization. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (holding that, for summary judgment purposes, factual disputes must be resolved in favor of the nonmovant). For the same reason, we also assume — consistent with the appellant's version of the facts but contrary to the stated observations of APHIS personnel — that the appellant's trees were not already infested when they were chopped down.

[4] The appellant also sued the contractor who removed the trees in a Massachusetts state court. See Evans v. Mayer Tree Serv., Inc., 46 N.E.3d 102 (Mass. App. Ct. 2016). That state court suit has no bearing on the issues before us.

government moved for summary judgment.  See Fed. R. Civ. P. 56(a).
The appellant opposed the motion.  In a thoughtful rescript, the
magistrate judge entered summary judgment in favor of the
government, concluding that the discretionary function exception
to liability under the FTCA barred the appellant's suit.  See
Evans, 2016 WL 5844473, at *8.  This timely appeal ensued.

**WE CAN WORK IT OUT**

We first discuss the discretionary function exception
and how it is designed to operate.  We then apply that exception
to the case at hand.

### Her Majesty

As a sovereign, the United States is immune from suit
without its consent.  See Shansky v. United States, 164 F.3d 688,
690 (1st Cir. 1999).  The FTCA provides for a limited waiver of
this sovereign immunity and authorizes suits against the United
States for certain torts.  See 28 U.S.C. § 1346(b)(1).  Broadly
speaking, the FTCA allows "civil actions on claims against the
United States" for "injury or loss of property . . . caused by the
negligent or wrongful act or omission of any employee of the
Government while acting within the scope of his office or
employment . . . where the United States, if a private person,
would be liable" under local law.  Id.

The FTCA must be "construed strictly in favor of the
federal government, and must not be enlarged beyond such boundaries

- 8 -

as its language plainly requires." Bolduc v. United States, 402 F.3d 50, 56 (1st Cir. 2005) (quoting United States v. Horn, 29 F.3d 754, 762 (1st Cir. 1994)). In addition, the FTCA's waiver of sovereign immunity is narrowed by exceptions. One such exception, commonly called the discretionary function exception, bars liability for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The analytic framework for use in connection with the discretionary function exception is familiar. The court must initially "identify the conduct that is alleged to have caused the harm." Fothergill v. United States, 566 F.3d 248, 252 (1st Cir. 2009). It must "then determine whether that conduct can fairly be described as discretionary." Id. If so, it must proceed to "decide whether the exercise or non-exercise of the granted discretion is actually or potentially influenced by policy considerations." Id. In sum, as long as the challenged conduct involves "the exercise of discretion in furtherance of public policy goals," claims under the FTCA are foreclosed by the discretionary function exception. United States v. Gaubert, 499 U.S. 315, 334 (1991). Because this is so "whether or not the discretion involved be abused," 28 U.S.C. § 2680(a), the presence

or absence of negligence is irrelevant to the applicability of the discretionary function exception, see Lopez v. United States, 376 F.3d 1055, 1057 (10th Cir. 2004); Rosebush v. United States, 119 F.3d 438, 442 (6th Cir. 1997).

We afford de novo review to the question of whether the discretionary function exception shields the government from liability in any given set of circumstances. See Irving v. United States, 162 F.3d 154, 162 (1st Cir. 1998) (en banc).

## **Tell Me Why**

In this instance, the challenged conduct is the destruction of the twenty-five maple trees without first securing the permission of either the appellant or his wife.[5]

With the conduct defined, the next question becomes whether that conduct was discretionary. The appellant argues that DCR's letter made securing property owner permission obligatory. He adds that the practice of seeking property owner permission was taken so seriously by the various governmental actors that it amounted to a nondiscretionary requirement for federal officials. We find these arguments unpersuasive.

---

[5] It is clear beyond peradventure that DCR had the authority under state law to order that the trees be cut down and removed. See Mass. Gen. Laws ch. 132, §§ 8, 11, 12. Thus, the crux of the harm is not that the appellant's trees were destroyed but, rather, that they were destroyed without first obtaining his permission.

- 10 -

The conduct of federal employees is generally held to be discretionary unless "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Berkovitz ex rel. Berkovitz v. United States, 486 U.S. 531, 536 (1988). State law will not suffice: only federal statutes, regulations, or policies will suffice to remove the discretion of a federal official for purposes of the discretionary function exception. See Carroll v. United States, 661 F.3d 87, 101 (1st Cir. 2011).

In this instance, DCR's quarantine order authorized APHIS to "undertake activities necessary [for stopping the spread of ALB,] including removing or causing to be removed . . . all [trees] that may be or have the potential to be infested or infected by ALB." The appellant does not deny that his trees were host trees, that is, trees that had the potential to be infested. He nonetheless argues that the letter that DCR sent to property owners requesting permission to enter onto their property and cut down trees announced an official state policy and thus imposed an obligation on cooperating federal officials to follow it. APHIS had no discretion, the appellant's thesis runs, to violate this mandatory state policy.

We do not agree. The appellant's thesis "conflates the merits of [his] claims with the question whether the United States has conferred jurisdiction on the courts to hear those claims in

- 11 -

the first place."  Carroll, 661 F.3d at 102 (quoting Sydnes v. United States, 523 F.3d 1179, 1184 (10th Cir. 2008)).  A state policy promulgated by a state agency, without more, cannot divest the federal government of its sovereign immunity.  See id. at 101-02.

Here, there was no "more."  All of the sources of federal authority that allowed APHIS to partner with DCR (such as the Plant Protection Act, 7 U.S.C. § 7751, federal regulations, 7 C.F.R. § 301.51—1-9, and the Agreement) are completely silent about any requirement of property owner permission as a condition precedent to tree removal.  Indeed, the Agreement gave federal employees discretion to "apply appropriate control measures utilizing host removal" as they deem necessary to halt the ALB epidemic.  No mention was made of any need for property owner permission.

The record makes manifest that, from APHIS's point of view, the decision about whether to remove a host tree without property owner permission was a judgment call — a judgment call that depended upon several interrelated factors, including the level and timing of infestation.  At bottom, this decision was to be based on scientific knowledge about the beetle and an informed assessment of what was at risk.  Property owner permission simply was not a determinative consideration in the decisional calculus.  State pronouncements aside, there was no federal requirement that

- 12 -

APHIS personnel secure (or even seek) such permission before taking action to curb the infestation.[6]

To be sure, APHIS tried to be respectful of the wishes of property owners. APHIS, however, had no binding policy to that effect: its overriding goal was to do whatever was necessary to prevent the spread of ALB. From a scientific standpoint, the best option often was to remove all host trees, regardless of whether they were already infested and regardless of whether property owner permission had been obtained. APHIS's decision to employ that option was squarely within the compass of its discretion. See Attallah v. United States, 955 F.2d 776, 783 (1st Cir. 1992) (concluding that discretionary function exception applies "where there is room for choice" in federal employee decisionmaking).

Seen in this light, property owner permission was a non-issue for APHIS. If host trees were infested, the destruction of those trees was required by law, whether or not the property owner consented. See Mass. Gen. Laws ch. 132, §§ 11, 12. If, however, host trees were only at risk of infestation, no federal law,

---

[6] The fact that private contractors hired by DCR to remove trees were contractually bound to obtain property owner permission before entering onto private property does not rise to the level of a federal law, regulation, or policy. And to the extent (if at all) that APHIS had an obligation to supervise those private contractors, "[w]hen an agency determines the extent to which it will supervise the . . . procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." United States v. Varig Airlines, 467 U.S. 797, 819-20 (1984).

- 13 -

regulation, or policy constrained APHIS' discretion by requiring the agency to obtain a property owner's permission before removing them.

As a fallback, the appellant argues that the Project's practice of obtaining property owner permission and keeping track of whether such permission had been received was taken so seriously that APHIS personnel had no discretion to disregard it. This is whistling past the graveyard. While APHIS personnel testified that they consistently made good-faith efforts to secure property owner permission prior to cutting down trees, their approach was a courtesy — not the product of any official federal policy. A federal bureaucrat's well-intentioned effort to employ best practices will not suffice to convert a discretionary act into a non-discretionary act. In this case, APHIS personnel had discretion about whether to seek property owner permission before removing host trees — and the fact that they frequently opted to seek such permission did not make their tree-removal decisions any less discretionary. See Gaubert, 499 U.S. at 334 ("If the routine or frequent nature of a decision were sufficient to remove an otherwise discretionary act from the scope of the [discretionary function] exception, then countless policy-based decisions by regulators exercising day-to-day supervisory authority would be actionable.")

Nor does the Agreement change this dynamic. In that document, APHIS agreed to launch an "effective public relations program" and keep the "public informed of the status of the eradication program." Nothing in the Agreement, though, limited federal employee discretion about how to implement this lofty goal. Such general guidelines are "insufficient to deprive the federal government of the protection of the discretionary function exception." Autery v. United States, 992 F.2d 1523, 1529 (11th Cir. 1993) (concluding that Park Service hazardous tree elimination program involved exercise of discretion in targeting trees for removal); see Shansky, 164 F.3d at 691 (finding statement in Park Service manual that "[t]he saving of human life will take precedence over all other management actions" left employees with discretion as to how to apply "aspirational goal"). Trying another tack, the appellant suggests that, at the time that his trees were cut down, the responsible contractor (hired by DCR) had not yet signed a compliance agreement with APHIS and, thus, had not agreed to comply with federal quarantine regulations governing interstate movement of regulated articles. See 7 C.F.R. § 301.51—6. This suggestion goes nowhere. Given that there was no evidence that the contractor intended to transport wood products across state lines, the absence of a signed compliance agreement simply has no bearing on the appellant's complaint that his trees were removed without his permission.

That ends this aspect of the matter.  We conclude that APHIS was exercising discretion when it acted to remove twenty-five host trees from the appellant's property without first securing his permission.

Despite this conclusion, our inquiry must continue.  The discretionary function exception protects only those discretionary choices that are "grounded in social, economic, and political policy."  United States v. Varig Airlines, 467 U.S. 797, 814 (1984).  We therefore turn to that question.

"Because the law presumes that the exercise of official discretion implicates policy judgments," the appellant bears the burden of demonstrating that the discretion exercised by APHIS in this instance was not susceptible to policy analysis.  Shansky, 164 F.3d at 692.  As we explain below, the appellant has failed to carry that burden.

We begin with bedrock.  Even if the on-the-ground decision to order the removal of the appellant's trees without first securing his permission was the product of either human error or faulty recordkeeping, "[t]he critical question is whether the acts or omissions that form the basis of the suit are susceptible to a policy-driven analysis, not whether they were the end product of a policy-driven analysis."  Id. (emphasis supplied).  Here, APHIS' choice among potential courses of action was plainly susceptible to a policy analysis.

In this regard, it is important to note that any decision about whether to require federal personnel to obtain property owner permission prior to removing host trees was necessarily "informed by a need to balance concerns about a myriad of factors." Fothergill, 566 F.3d at 253. APHIS scientists recognized that an uncontrolled ALB infestation could be devastating to local economies and environments, so they worked with DCR to devise a policy that would empower APHIS personnel to take appropriate steps to try and avert the harm. Consistent with this policy, APHIS adopted a practice of making a good-faith effort to seek property owner permission before removing trees, but stopped well short of making such permission a condition precedent to any tree removal. In other words, APHIS made a policy determination, based on studies of previous infestations and the biological characteristics of the ALB, to allow its employees more latitude in order to improve the chances of stemming the infestation — and as part of this policy determination, APHIS chose not to require property owner permission as an invariable condition to the removal of host trees (whether or not already infested). This choice was a quintessential policy decision of the kind that the discretionary function exception was designed to protect. See Autery, 992 F.2d at 1531.

To say more would be supererogatory. As the magistrate judge ruled, APHIS's decision to cut down the appellant's trees

without first securing his permission constituted a policy-driven exercise of discretion and, thus, falls under the protective carapace of the discretionary function exception. It follows that the entry of summary judgment in favor of the government must stand.

**LET IT BE**

We need go no further. While we are not without sympathy for the appellant's plight — the unexpected loss of twenty-five majestic shade trees must have been a bitter pill to swallow — Congress has been clear about the federal government's sovereign immunity. That immunity, as exemplified by the discretionary function exception, pretermits the appellant's effort to recover damages under the FTCA. We therefore affirm the decision of the magistrate judge.

**Affirmed.  No costs.**