[Cite as *State v. Breneman*, 2015-Ohio-4783.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   2013-CA-27 |
| | : | |
| v. | : | T.C. NO. 13CR50 |
| | : | |
| JAMES D. BRENEMAN | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the __20th__ day of ___November____, 2015.

. . . . . . . . . .

JANE A. NAPIER, Atty. Reg. No. 0061426, Assistant Prosecuting Attorney, 200 North Main Street, Urbana, Ohio 43078
        Attorney for Plaintiff-Appellee

BRADLEY S. BALDWIN, Atty. Reg. No. 0070186, 854 E. Franklin Street, Centerville, Ohio 45459
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, P.J.

{¶ 1} James D. Breneman was found guilty by a jury in the Champaign County Court of Common Pleas of two counts of possession of cocaine, both felonies of the fifth degree. The jury acquitted him of one count of possession of heroin. The court

imposed sentences of six months and eleven months for the two charges and ordered that they be served consecutively.

{¶ 2} Breneman appeals from his convictions, claiming that the trial court erred in allowing certain evidence to be admitted and that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

## I. Appellate Procedural History

{¶ 3} Breneman's original appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), stating that after thoroughly examining the record and the law, he found "no errors by the trial court prejudicial to the rights of appellant." By entry, we informed Breneman that his attorney had filed an *Anders* brief on his behalf and granted him 60 days from that date to file a pro se brief. Breneman filed a motion for appointment of new counsel, raising seven grounds for reversing his conviction. We construed Breneman's motion to be his pro se brief.

{¶ 4} Upon an initial review of the record, we noticed that neither the presentence investigation report nor a transcript of the hearing on a motion to suppress were part of the record. We ordered the record to be supplemented with these items and allowed counsel to file a supplemental brief to raise any issues arising from those filings. Counsel's supplemental brief indicated that no additional issues were identified, and he again sought to withdraw as counsel.

{¶ 5} While conducting our independent review of the record pursuant to *Penson*

*v. Ohio*, 488 U.S. 75, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988), we concluded that a non-frivolous issue existed as to whether inadmissible evidence, which was prejudicial to Breneman, was improperly admitted at trial.   We ordered new counsel to be appointed.

{¶ 6} Breneman, with new counsel, now raises three assignments of error on appeal.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 7}  In his second and third assignments of error, Breneman claims that his convictions for possession of cocaine were based on insufficient evidence and were against the manifest weight of the evidence.   Breneman asserts that the State did not present adequate evidence that he constructively possessed the drugs at issue. Breneman's convictions for possession of cocaine were based on a crack pipe located in the kitchen (Count Two) and a razor blade located in Breneman's bedroom (Count Three).

{¶ 8}  "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 9} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   *Wilson* at ¶ 12. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 ("'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion").   When evaluating whether a conviction is against the manifest weight of the evidence, the

appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 10} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 11} R.C. 2925.11(A) prohibits a person from knowingly possessing drugs. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 12} "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."

R.C. 2925.01(K). "Possession of a drug may be either actual physical possession or constructive possession. A person has constructive possession of an item when he is conscious of the presence of the object and able to exercise dominion and control over that item, even if it is not within his immediate physical possession." (Citations omitted.) *State v. Mabry*, 2d Dist. Montgomery No. 21569, 2007-Ohio-1895, ¶ 18. "Establishment of ownership is not required." *State v. Rastbichler*, 2d Dist. Montgomery No. 25753, 2014-Ohio-628, ¶ 33. In determining whether an individual possessed drugs, it is necessary to consider all of the facts and circumstances surrounding the incident. *Mabry* at ¶ 20.

{¶ 13} According to the State's evidence at trial, Breneman rented a bedroom in a home owned by Dave McLaughlin at 1222 Norwood Avenue in Urbana. In December 2012, Breneman's bedroom was the northwest bedroom, and he locked the bedroom door with a padlock when he was not home. McLaughlin resided in the master bedroom, and Shane Ferryman lived in the northeast bedroom of the house.

{¶ 14} On December 11, 2012, the Urbana Police Department decided to obtain a search warrant for the Norwood residence. While the application for the warrant was being prepared, Sgt. Josh Jacobs instructed Officer Brandon Deskins (a state parole/ probation officer), Probation Officer Matt Hauenstein, and Police Officer Mike Hughes to secure the residence. After Sgt. Jacobs was advised that no one was there, Jacobs instructed the officers to make sure no one entered or exited the residence.

{¶ 15} While Officer Deskins was standing in the driveway, he saw Breneman drive toward the home and turn on a blinker as if he planned to turn into the driveway. Deskins testified that it appeared that Breneman saw a police cruiser and Deskins's vehicle in the

driveway.   Breneman then turned off his turn signal and drove past the house.

{¶ 16} The officers found no signs that anyone was home, but the officers observed a dog loose in the house.   After a search warrant was obtained, Sgt. Jacobs contacted McLaughlin to ask what could be done about the dog.   McLaughlin responded that he would contact the dog's owner to pick up the dog.   Sgt. Jacobs went to the residence with the search warrant.

{¶ 17} Breneman later arrived at the Norwood residence and told the officers he was there for the dog.   Breneman told Jacobs that he rented a room at the house, that his room was locked, and that he had a key to it.   Sgt. Josh Jacobs informed Breneman that the search warrant was for the entire house and that the room would be forcibly entered if no key were provided.   Breneman provided a key, retrieved the dog, and left the residence.

{¶ 18} Officers located several drug-related items in the home.   A black pipe for smoking marijuana was found underneath the couch in the living room; the pipe tested positive for THC, the active ingredient in marijuana.   Two crack pipes, one of which appeared to be a socket wrench, were found in a wooden drawer in the "play area" of the garage; both tested positive for cocaine.   A white crack pipe was located behind a mirror in the kitchen; the pipe tested positive for cocaine.   Rolling papers were found near the pipe.   A spoon and cotton ball, used to prepare heroin, were also found in the kitchen; the spoon tested positive for heroin.   Another spoon with a cotton ball was found in the closet of Ferryman's room; the spoon tested positive for heroin.   Only trace amounts of drugs were found.

{¶ 19} In Breneman's bedroom, officers located a razor blade on a television stand;

the razor blade had trace amounts of cocaine and THC. Marijuana screens and hemostats (small clamping scissors that can be used to hold a marijuana cigarette) were also found on the television stand. Sgt. Jacobs testified that he saw a "drug ledger," which noted how much certain individuals owed for drugs already provided. Two boxes of sandwich baggies, which are used to package smaller pieces of drugs, and tied-off pieces of small baggies were found. A metal grinder, with some marijuana inside, was found in a drawer.

{¶ 20} The State presented evidence to substantiate that the northwest bedroom belonged to Breneman. As stated above, Breneman told Sgt. Jacobs that he resided in the northwest bedroom and Breneman provided Jacobs with the key to the padlock for the bedroom door. Officer Deskins saw clothing in the room that was consistent with the clothing that Breneman liked to wear. Breneman's driver's license was located in the bedroom on top of a filing cabinet in the closet. A bedside table drawer contained (1) a court document relating to a prior criminal case involving Breneman and (2) a key fob for a vehicle with a tag that said "JD." The bedroom also contained an envelope addressed to "J.D. Breneman" and a compact disk labeled "Inc. #095100, J.D. Breneman, Photographs."

{¶ 21} Ashley Gibson testified that she purchased heroin from Breneman. She stated that she would contact Breneman, and Breneman would typically send Ferryman with the drugs. On a few occasions, Gibson obtained drugs directly from Breneman.

{¶ 22} Gibson stated that she lived at 1222 Norwood Avenue for approximately one month in the summer of 2012. She saw Breneman possess heroin and saw him package cocaine or heroin in the kitchen. Gibson stated that Breneman kept his drugs

in his bedroom, and she once found cocaine and heroin stored inside a lint roller in his bedroom. Gibson testified that she bought drugs from Breneman and Ferryman at the house, but she did not observe other drug transactions. Gibson did not observe Breneman or Ferryman using drugs.

{¶ 23} Finally, the State introduced a recorded telephone conversation between Breneman, who was in jail, and his girlfriend, Tameeka Chamberlain. The recording was made on February 9, 2013, the day Breneman was booked into the jail, but nearly two months after the execution of the search warrant. During the conversation, Breneman instructed Chamberlain to immediately go to "Dave's house," retrieve certain items from his (Breneman's) bedroom and Landers's bedroom, and put a plate from his bedroom in the kitchen sink and run water over it. Breneman also asked Chamberlain to put the retrieved items in a waterproof bag and to put the bag "deep in the woods somewhere," to set up a prepaid phone account, and to turn off his "work phone." Breneman told Chamberlain to "get out of there immediately," but not to transport items in his car.

{¶ 24} At one point in the telephone conversation, Chamberlain passed the phone to McLaughlin, and Breneman talked with him. Breneman informed McLaughlin that there was likely a warrant for his (McLaughlin's) arrest and of the charges for which Breneman was arrested. Breneman emphasized to McLaughlin to "remember" that Breneman did not live at the house, that Breneman drove for him, and that he (Breneman) only rented a room from time to time.

{¶ 25} The defense offered three witnesses on Breneman's behalf – Uzyssie Landers, Shane Ferryman, and Breneman himself.

{¶ 26} Uzyssie Landers testified that he lived at 1222 Norwood Avenue from

around October through December 2012, and he worked for McLaughlin, who had a carpet-cleaning business. Landers stated that Breneman, Ferryman, Amanda Neer, and Jason Karg stayed at the residence "on and off." Landers saw Neer use heroin there on a daily basis and crack cocaine two or three times per week, either in the bathroom or a bedroom, including Breneman's bedroom. Landers saw Karg and visitors to the residence also use drugs in the house. Landers "never" saw Breneman use heroin or cocaine, but he did see Breneman use marijuana. Landers indicated that the kitchen was a "community kitchen" that everyone used, and people used crack cocaine there; some days, such as weekends, there were 10 to 12 people in the kitchen.

{¶ 27} Landers testified that he saw Neer using a razor blade at the house. Between Thanksgiving and December 11, 2012, Karg also used a razor blade while installing a surround sound system in Breneman's bedroom. Landers stated that Breneman did not engage in selling drugs at the house.

{¶ 28} Landers testified that he was at the Norwood residence with Neer on December 11, 2012, when a probation officer knocked on the door. Neer and Landers remained in the house unseen for "hours." Neer was in and out of Breneman's bedroom "the whole time the police were outside," and she locked the padlock on Breneman's door before leaving the house. Landers stated that, after it became dark outside, he and Neer climbed out of the window of the northeast bedroom using an above-ground pool ladder.

{¶ 29} Shane Ferryman testified that he worked for McLaughlin, and in November and December 2012, he sporadically stayed at McLaughlin's house when it was convenient for work-related purposes; he used the room previously used by Karg and Neer. During that time, Ferryman saw McLaughlin, Breneman, Neer, Karg, Gibson,

Landers, and McLaughlin's girlfriend, Dawn Clark, at the house on a regular basis. Ferryman testified that Breneman would "come and go" and spent approximately five to ten nights at the house. Ferryman saw Neer use heroin and crack cocaine, Gibson and Karg use heroin, and Breneman and Landers use marijuana at the house. Ferryman stated that he was last at 1222 Norwood Avenue on December 11, 2012, the day the search warrant was executed.

{¶ 30} Ferryman stated that people sometimes went in and out of the house through the northeast bedroom window. Ferryman testified that they "actually left the pool ladder outside the window so that we could get in through the bedroom * * * whenever we got locked out."

{¶ 31} Ferryman stated that locks were installed on the northwest bedroom and the bedroom used by Landers within a week of December 11. Ferryman indicated the locks came from the same package and the keys for the locks were the same, so Breneman and Landers both had keys to the locks. Ferryman testified that the locks were added due to thefts, but people who were trusted, such as Neer and Ferryman, could go in and out of Breneman's room.

{¶ 32} Ferryman stated that he witnessed individuals using drugs in the kitchen; on one occasion, he saw Karg smoking crack cocaine there. Ferryman stated that Neer and Karg used a small, white crack pipe to ingest crack cocaine. Ferryman recalled Karg's using a razor blade while Karg, Ferryman, and Breneman installed a surround sound system in Breneman's bedroom.

{¶ 33} Breneman testified that he worked for McLaughlin as a van driver, and that he stayed at 1222 Norwood Avenue on occasion, beginning in July 2012. Breneman

denied that he lived at the house. Breneman stated that, in order to protect his property from theft, he added a padlock to the door of the northwest bedroom sometime between December 7 and December 10, 2012. Breneman had bought a two-pack of padlocks from Walmart, and the keys fit both locks. Landers had the other lock and key.

{¶ 34} Breneman denied that he used or possessed cocaine or heroin at 1222 Norwood in 2012. He admitted to having marijuana and marijuana equipment and to smoking marijuana at the house, and he acknowledged that he had sold cocaine out of the house from 2003 to 2007. Breneman denied selling drugs to Gibson in 2012 or selling heroin at any time. Breneman stated that he had seen McLaughlin, McLaughlin's girlfriend, Karg, and Neer smoke cocaine in the house; Gibson smoked crack cocaine. Breneman also saw Karg, Gibson, and Neer use heroin in the house. Breneman did not see individuals cook drugs on a spoon.

{¶ 35} Breneman testified that the razor blade at issue was used by Karg to split wires while hanging a sound system in Breneman's room. Breneman stated that Karg got the razor blade from the kitchen and that it had been on the kitchen table for a long time. Breneman had seen Neer and McLaughlin use the blade to cut crack cocaine.

{¶ 36} Breneman further testified that the crack pipe in the kitchen was beside "Dave's chair behind his mirror." Breneman stated that McLaughlin would get the crack pipe out when "his women" came over, and that Neer, Karg, Gibson, and Clark also used the crack pipe.

{¶ 37} Breneman testified regarding the recorded telephone call from the jail and acknowledged it was a conversation between him and his girlfriend, Chamberlain. Breneman stated that he was directing Chamberlain to get his money (about $4,000),

rare coins, hash, and medical marijuana.   Breneman denied that he had talked to her about cocaine or heroin.

{¶ 38} Breneman stated that he was last at 1222 Norwood Avenue on February 3, 2013.   At that time, the ladder was still outside the window of the northeast bedroom. Breneman testified that he saw the ladder near the garage during the jury view of the property on the first day of trial.

{¶ 39} Breneman acknowledged that he had several prior convictions, including convictions for receiving stolen property, illegal manufacture of drugs, possession of cocaine, and having weapons while under disability.   Breneman testified that a conviction for trafficking in cocaine and possession of cocaine was reversed on appeal.

{¶ 40} The State recalled Officer Deskins as a rebuttal witness.   Deskins testified that no ladder was located next to a window of the house.   He stated that he would have removed the ladder from the window had he found one.   Deskins testified that, initially, there were three officers located along different sides of the house, and more officers came later.   Deskins further stated that, based upon his past experiences, the actions of the dog within the home was consistent with no one being present in the house.

{¶ 41} Upon review of the evidence, we find that Breneman's conviction for possession of cocaine based on the razor blade was based on sufficient evident and was not against the manifest weight of the evidence.   The State produced substantial evidence that Breneman resided in the northwest bedroom, where the razor blade was found.   He told Sgt. Jacobs that he rented that room, he provided a key for the padlock on the door, he referred to the room in the recorded jail telephone call as his room, and the room contained his driver's license, a key fob with his initials, court documents

concerning his prior appellate court case, and clothing consistent with his clothing. The jury could have reasonably concluded that he possessed the razor blade found on the television table in that room.

{¶ 42} The defense presented several witnesses that testified that the razor blade was brought into Breneman's bedroom from the kitchen by Jason Karg when the surround sound system was installed in the bedroom shortly before the December 11 raid. Landers also recalled Neer using a razor blade. However, Sgt. Jacobs testified that a razor blade or something sharp would be used to cut cocaine (Tr. 351), and Gibson testified that she saw Breneman package cocaine or heroin in the kitchen. The razor blade had trace amounts of cocaine and THC, an ingredient of marijuana. Several items associated with marijuana use were also found in Breneman's bedroom, and Breneman acknowledged that he used and sold marijuana.

{¶ 43} It was the province of the jury to assess the witnesses' credibility and determine whether the State had proven its case beyond a reasonable doubt. Based on the evidence, we cannot conclude that the jury lost its way when it convicted Breneman of the possession of cocaine based on the razor blade.

{¶ 44} The State also presented sufficient evidence that Breneman constructively possessed the crack pipe found behind a mirror in the kitchen. Although Breneman told Sgt. Jacobs that he only rented a room in the house, there was evidence that Breneman used the kitchen, a common area of the house. Gibson testified that she saw Breneman packaging drugs in the kitchen, and Breneman's dog was found loose in the house, including in the kitchen. Breneman's own testimony established that he had knowledge of the presence of the crack pipe behind the mirror, that several people used it, and that

Breneman had the ability to exercise dominion and control over it.

{¶ 45} However, under the specific facts of this case, the circumstances do not support a conclusion that Breneman constructively possessed the crack pipe when the pipe was seized by the police. We have stated that "[r]eadily usable drugs found in very close proximity to a person may constitute circumstantial evidence sufficient to support a finding that the person constructively possessed those drugs," *State v. Griffith*, 2d Dist. Montgomery No. 26451, 2015-Ohio-4112, ¶ 31, but Breneman was not at home when the police executed the search warrant, nor was there evidence that Breneman had been to the house that day. Breneman drove by the house while a search warrant was being sought, and he later came to house to retrieve his dog, but he left the residence before the search began. The jury could not reasonably infer that Breneman constructively possessed the crack pipe in the kitchen based on the circumstances surrounding the discovery of the crack pipe.

{¶ 46} Moreover, several residents and visitors to the Norwood Avenue home used crack cocaine, but there was no evidence that Breneman used crack cocaine or exercised dominion and control over the crack pipe in the kitchen. Gibson (a State's witness) and Landers testified that they did not observe Breneman use drugs, and Ferryman and Breneman testified that Breneman only used marijuana. Breneman expressly denied using cocaine and heroin, and he identified the crack pipe as belonging to McLaughlin. When the prosecutor asked Sgt. Jacobs about Gibson's testimony that Breneman did not use drugs, Sgt. Jacobs explained that a "'good' drug dealer is a drug dealer who doesn't use his product. When he doesn't use the product, any money that he makes * * * from selling that is profit money for them in order to make money. So when Ms. Gibson

testified that Mr. Breneman doesn't use heroin or crack cocaine or cocaine, that doesn't surprise me very much at all."   (Tr. 372-373.)

{¶ 47} In short, the crack pipe was found hidden in a common area of the home, which was used by numerous people who smoked crack cocaine; Breneman was not one of the people who used crack cocaine.   There was no evidence that Breneman had "control over" the crack pipe.   *See* R.C. 2925.01(K) (definition of "possession").   Rather, the evidence demonstrates that Breneman merely had access to the crack pipe through occupation of the premises where it was found, which does not support a finding of possession.   *Id.*   Based on the circumstances presented, we agree with Breneman that his conviction for possession of cocaine based on the crack pipe in the kitchen was against the manifest weight of the evidence.

{¶ 48} Breneman's second assignment of error is overruled.   Breneman's third assignment of error is sustained as to Count Two (crack pipe) and overruled as to Count Three (razor blade).

### III. Evidentiary Issue: Jail Telephone Call

{¶ 49} In the first portion of Breneman's first assignment of error, Breneman claims that the trial court abused its discretion in admitting the recording of the jailhouse telephone call placed by Breneman on February 9, 2013.   Breneman claims that (1) the recording was irrelevant to whether he possessed heroin or cocaine on December 11, 2012, and (2) the probative value was substantially outweighed by the danger of unfair prejudice.   At trial, Breneman did not object to the recording on the basis of relevancy. Thus, we review the admission of the recording for plain error.

{¶ 50} In order to constitute plain error, the error must be an obvious defect in the

trial proceedings, and the error must have affected substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). The Ohio Supreme Court has recently reiterated that, even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 23. Rather, plain error should be noticed "with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice." (Emphasis added in *Rogers*). *Id.*, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 51} Decisions regarding the admissibility of evidence at trial are within the broad discretion of the trial court and will be upheld absent an abuse of discretion and material prejudice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43. The relevant inquiry is whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issue. *Id.*

{¶ 52} Relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. However, even relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A).

{¶ 53} As stated above, the State introduced a recorded telephone conversation between Breneman and his girlfriend, Tameeka Chamberlain, which was made on

February 9, 2013, the day Breneman was booked into the jail, but approximately two months after the search. During the conversation, Breneman instructed Chamberlain to immediately go to "Dave's house," get a silver clock from his bedroom, get a "packet" from a cup of change in his bedroom, and put a plate from his bedroom in the kitchen sink and run water over it. Breneman also told Chamberlain to retrieve items from Landers's room in the house. Breneman asked Chamberlain to put the items in a waterproof bag and to put the bag "deep in the woods somewhere" and also to set up a prepaid phone account. Breneman told Chamberlain to "get out of there immediately," but not to transport these items in his car. Breneman also spoke with McLaughlin and warned him that there might be an arrest warrant for him. Breneman also emphasized to McLaughlin that he (Breneman) did not live in the house, but only rented a room from McLaughlin from time to time.

{¶ 54} Although the recorded conversation occurred nearly two months after the razor blade and crack pipe were seized, the conversation was relevant to demonstrate that Breneman resided at the house and hid items in multiple locations. While talking with Chamberlain, Breneman repeatedly referred to the bedroom in which he stayed as "my room," and Breneman instructed McLaughlin to leave his room locked up. The recording indicated that Breneman would attempt to minimize his association with the Norwood Avenue residence, as demonstrated by Breneman's statements to McLaughlin that McLaughlin needed to "remember" that Breneman did not live at the house and only rented a room from time to time. In addition, Breneman instructed Chamberlain to retrieve items from his room and from Landers's room, and he told her not to drive with the items in his car, thus implying that the items were contraband. However, Breneman

did not identify any of the items as drugs.

{¶ 55} The trial court did not abuse its discretion and commit plain error in admitting the recorded telephone call, particularly in the absence of an objection. The recording was marginally relevant to establishing that Breneman possessed items within the northwest bedroom and that he had possessions in other portions of the house. The recording's probative value was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury, especially since Breneman admitted to possessing and using marijuana in the house. This portion of the first assignment of error is overruled.

### IV. Evidentiary Issue: Redacted Court Documents

{¶ 56} Breneman further claims that the trial court abused its discretion in admitting State's Exhibit 13, a photograph of the contents of a drawer in Breneman's bedroom, without redacting the trial judge's name from a document found inside the drawer. Breneman did not raise this issue at trial. Accordingly, we review it for plain error.

{¶ 57} The State introduced three photographs of the contents of a bedside table drawer in Breneman's bedroom. Each of the photographs included the front page of a court document, specifically an appellate opinion in a prior criminal case against Breneman. Exhibit 10 is a photograph of the contents of the desk drawer from a distance; the court document is blurry and not legible. Exhibit 11 is a close-up photograph of the court document's caption. Exhibit 13 is a close-up photograph of several items in the drawer. Only a small portion of the court document is shown in Exhibit 13, but that portion includes most of the prosecutor's name, most of defense

counsel's name, and a portion of the name of the judge who authored the appellate opinion.

{¶ 58} During the State's case-in-chief, the State told the court that State's Exhibit 11 was being introduced "to show that [Breneman] had personal effects in his bedroom, that he had dominion and control over the bedroom." (Tr. 337.) The State indicated that "[t]here are other items in other photographs that also show this, which the State also intends to introduce. So it's not being introduced for the purpose of discussing his prior criminal case, it's for personal items that he has[:] mail, legal papers, keys, driver's license." (Tr. 337.) The parties agreed that the State's witnesses would refer to the court document as "legal papers" and that Exhibits 10 and 11 would not be shown to the jury unless Breneman testified. Exhibit 13 was not discussed.

{¶ 59} Breneman testified at trial. During the discussion of the admission of exhibits following the conclusion of all of the testimony, the State indicated that there needed to be a discussion regarding "the manner in which the Exhibits 10 and 11 at this point can be presented to the jury and whether or not some redaction needs to take place so as not to unfairly prejudice the defendant when the jury views the photographs of the defendant's legal paperwork depicting his prior criminal appeal and also the fact that it lists the then prosecuting attorney's name and may cause some confusion for the jury in that Your Honor was the prosecutor at the time – at least the prosecutor in the office."

{¶ 60} The court ordered that the prosecutor's name and attorney number be redacted from State's Exhibit 11 and that both the prosecutor's and defense counsel's names and attorney numbers be redacted from State's Exhibit 10. State's Exhibit 13 was not discussed separately, and it was admitted without objection.

{¶ 61} Upon overlaying State's Exhibits 11 and 13, it is apparent that the jury could have noticed that the prosecuting attorney in Breneman's prior criminal case was the judge who presided over this trial. Considering the care that the parties and the court took to ensure that the attorneys' names were redacted from State's Exhibits 10 and 11, the failure to address the attorneys' names on State's Exhibit 13 appears to have been an oversight.

{¶ 62} Regardless, we cannot conclude that Breneman was prejudiced by the failure to redact State's Exhibit 13. State's Exhibits 10, 11, and 13 were offered to demonstrate that objects belonging to Breneman were located in the northwest bedroom and, by extension, that the bedroom was Breneman's. State's Exhibit 10 and 11, which showed the caption of the appellate opinion, focused on the court document; State's Exhibit 13 did not. When testifying about State's Exhibit 13 at trial, Sgt. Jacobs stated that the photograph was a close-up of the key fob with a "JD" tag. No mention was made of the court document in the discussion of State's Exhibit 13. At no time was the prosecutor's name highlighted for the jury. We also note that Breneman was acquitted on the possession of heroin charge, which further supports a conclusion that the failure to redact State's Exhibit 13 did not prejudice Breneman.

{¶ 63} Upon review of the record as a whole, we cannot conclude that the outcome of Breneman's trial was affected by failure to redact the prosecutor's name from State's Exhibit 13. This portion of the first assignment of error is overruled.

## V. Conclusion

{¶ 64} The trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Jane A. Napier
Bradley S. Baldwin
James D. Breneman
Hon. Nick A. Selvaggio