[Cite as *State v. Harris*, 2016-Ohio-7097.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   26810 |
| | : | |
| v. | : | T.C. NO. 14CR3826 |
| | : | |
| DARREN HARRIS | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___30th___ day of _____September_____, 2016.

. . . . . . . . . .

ANN M. GRABER, Atty. Reg. No. 0091731, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ENRIQUE G. RIVERA-CEREZO, Atty. Reg. No. 0085053, 61 N. Dixie Drive, Suite B, Vandalia, Ohio 45377
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} After a jury trial in the Montgomery County Court of Common Pleas, Darren Harris was convicted of having weapons while under disability and possession of heroin, with a firearm specification.   The court imposed concurrent sentences of 30 months and 18 months in prison for the offenses, respectively, and one year (12 months) in prison for the firearm specification, to be served consecutively to and prior to the aggregate 30-

month sentence.   Harris's total sentence was 42 months in prison.

{¶ 2} Harris appeals from his conviction, claiming that the trial court erred in overruling his pretrial motion to suppress, that he received ineffective assistance of counsel at trial, and that his convictions were based on insufficient evidence and against the manifest weight of the evidence.   For the following reasons, the trial court's judgment will be affirmed.

## I. Motion to Suppress

{¶ 3} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses."   *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994*); State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30.   Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence.   *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard."   *Id.*   We emphasize that, when reviewing suppression rulings, we consider only the evidence before the trial court at the suppression hearing; we cannot consider any additional evidence presented at a subsequent trial.

{¶ 4} At the suppression hearing, Dayton Police Officers Christopher Savage and Sean Humphrey testified regarding their warrantless entry into an apartment on Germantown Street, where heroin and a handgun were located.   Harris's sister, Deborah Harris ("Deborah"), and his girlfriend, Darlisa Lloyd ("Darlisa"), testified for the defense regarding the officers' entry.   Harris testified on his own behalf regarding his standing to

challenge the officers' conduct.

{¶ 5} Harris testified that, approximately two weeks before November 4, 2014, he began staying at an apartment on Germantown Street that was rented by his sister, Deborah. On November 4, he was living at the Germantown Street apartment and commonly stayed there overnight (five nights per week), he had a key to the apartment, and he received mail there. Harris indicated that he stayed in the living room of the apartment, and he kept his belongings in the living room closet. He helped with the upkeep of the apartment, but he did not contribute financially. Darlisa also stayed at the apartment with him. Harris had provided the Germantown Street address to his parole officer, and he testified that he felt that he had an expectation of privacy when he was in that apartment. Harris was present in the apartment on November 4, 2014, and he had stayed there overnight the night before.

{¶ 6} According to the officers' testimony at the suppression hearing, in November 2014, Dayton Police Officers Christopher Savage, Jacob Rillo, Sean Humphrey, and Mark Oreck were working as part of the department's Community Problem Response Team (CPRT). Savage explained that the primary duties of the CPRT were to "respond to long-term problems, responds [sic] to drug complaints that come in through citizens and through crime stoppers, [as] well as respond to crime patterns and conduct patrol." The four officers work together, but travel in pairs in two cruisers.

{¶ 7} "A day or two" before November 4, the Dayton Police Department received a tip, through Crime Stoppers, that there were drugs being sold out of Deborah Harris's apartment. The tip included a street address on Germantown Street and identified the specific apartment as "the second unit from Germantown." The tip was assigned to the

CPRT, and Officer Savage was primarily responsible for investigating the complaint.

{¶ 8} On the morning of November 4, the four uniformed officers drove to the Germantown Street apartment to investigate the complaint, and located the second unit from the street (Apartment B). Officers Oreck and Rillo went to the back of the residence; Officers Savage and Humphrey went to the front door. Officer Savage knocked on the door, and Harris responded, opening the front door "[a]pproximately 75 to 80 percent of the way." Savage stated, "Hi. I'm Officer Savage from the Dayton Police Department," and he asked if Deborah were there. Harris opened the door all the way, stepped back, and motioned with his arm that Deborah was to his (Harris's) right in the living room.

{¶ 9} With the door open, Officers Savage and Humphrey could see a glass kitchen table behind Harris. The table held a couple of razor blades, a couple of digital scales, credit cards, a few gelatin capsules, and a box of sandwich baggies. Humphrey testified that the items were common in the packaging of heroin for sale. The officers also saw "brown like residue" on the table and scales that, based on their training and experience, appeared to be heroin residue.

{¶ 10} Officer Savage testified that, when he saw the drug paraphernalia on the table, he "immediately stepped" into the apartment and grabbed Harris to prevent him from reaching any of the items. Officer Humphrey entered the apartment immediately after Savage. The officers saw that there were a total of four individuals in the apartment. A woman, later identified as Darlisa, "darted out" from the living room and headed quickly toward the back of the apartment. Humphrey feared that the woman would obtain a weapon, and he ordered her to stop. When the woman did not comply, Officer Humphrey followed her toward a back bedroom, detained her, and brought her back to

the living room. Officer Savage notified Officers Oreck and Rillo to come around to the front of the house to assist, "since there were several people inside the house and there was drug paraphernalia in plain sight." Savage and Humphrey both testified that they were concerned, based on the presence of items used for drug packaging, that guns could be present in the apartment.

{¶ 11} After Officer Humphrey brought Darlisa back to the living room area, he returned to the back bedroom "to make sure there wasn't any other individuals back in that back bedroom." Humphrey saw a firearm and a bag with chunks of heroin on top of a dresser in the bedroom. Medication and an identification card were next to the firearm.

{¶ 12} Deborah's and Darlisa's version of events differed somewhat from the officers' version. Deborah testified that she was in her bedroom on the morning of November 4, 2014, when she was awakened by pounding on her apartment door. Harris was in the living room with his girlfriend and a male friend of Deborah, and Deborah called to Harris to answer the door. Deborah got up and went to her bedroom door. She saw that Harris had the front door mostly open and that police officers were standing outside. Deborah walked toward the living room and heard an officer ask for her. The officers then "pushed the door in" and came into her apartment.

{¶ 13} When the officers entered, Darlisa was heading toward the bathroom, which was located across from the bedroom. Darlisa stated that she went there, because she did not have any clothes on; she was not trying to avoid the police, destroy evidence, or obtain a weapon. The officers instructed Darlisa to stop. Both Deborah and Darlisa testified that Darlisa complied with the officers' instruction, and Darlisa returned to the living room.

{¶ 14} On December 10, 2014, Harris was indicted for having weapons while under disability and possession of heroin, with a firearm specification, based on evidence seized on November 4 from Deborah's apartment. In February 2015, Harris moved to suppress the evidence, claiming that he had a reasonable expectation of privacy in his sister's apartment, that the officers unlawfully entered the apartment without consent or a warrant, and that the incriminating nature of the firearm and baggie on the bedroom dresser was not immediately apparent and thus the plain view doctrine did not apply to those items.

{¶ 15} A hearing on the motion to suppress was held on two dates in March 2015. After the hearing, the parties submitted supplemental memoranda, in which Harris argued that the State failed to establish that exigent circumstances existed to justify the officers' entry into the apartment, that the police conducted a lawful protective sweep, and that the items on the table near the front door were in plain view. Harris also asserted that the officers lacked probable cause to arrest him for the items found in the bedroom.

{¶ 16} The trial court overruled Harris's motion to suppress. It concluded that Harris had standing to challenge the officers' entry into the apartment, but that exigent circumstances justified the officers' entry. The court found that, when Harris opened the door completely, Officers Savage and Humphrey could see drug paraphernalia and heroin residue, in plain view, on a table. The court stated that, "[i]f the officers had left without securing the contraband, it very likely would have been removed or destroyed. Thus, exigent circumstances existed to enter the apartment to prevent the loss, removal or destruction of contraband." The court further found that the officers were justified in conducting a protective sweep and that Officer Humphrey's testimony established that his protective sweep was limited to the area that was in the vicinity of where the woman

[Darlisa] was headed and was no more than a cursory visual inspection of the bedroom."

{¶ 17} On appeal, Harris claims that the trial court erred in finding that exigent circumstances justified the officers' entry into the home. He argues that the apartment was dark, and that "it would be almost impossible for the officers in the hallway to observe the razors and the baggies given the diminutive size of the items and the darkness in the apartment." Harris further claims that the State did not establish that the officers were entitled to conduct a protective sweep.

{¶ 18} The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution protect individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Pressley*, 2d Dist. Montgomery No. 24852, 2012-Ohio-4083, ¶ 18. "Under applicable legal standards, the State has the burden of showing the validity of a warrantless search, because warrantless searches are 'per se unreasonable under the Fourth Amendment --- subject only to a few specifically established and well delineated exceptions.' " *State v. Hilton*, 2d Dist. Champaign No. 08-CA-18, 2009-Ohio-5744, ¶ 21-22, citing *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988). Exigent circumstances are a well-established exception to the Fourth Amendment's warrant requirement. *State v. Lam*, 2015-Ohio-4293, 46 N.E.3d 138, ¶ 12 (2d Dist.).

{¶ 19} The exigent or emergency circumstances exception to the warrant requirement applies in a variety of situations, including when entry into a building is necessary to protect or preserve life, to prevent physical harm to persons or property, or to prevent the concealment or destruction of evidence, or when officers are in "hot pursuit" of a fleeing suspect or someone inside poses a danger to the police officer's safety. *E.g.,*

*State v. Goode*, 2d Dist. Montgomery No. 25175, 2013-Ohio-958, ¶ 13; *Kentucky v. King*, 563 U.S. 452, 460, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011). "In order to justify an exception to the warrant requirement, the costs involved in obtaining a warrant must be sufficiently significant to justify avoiding the delay inherent in procuring a warrant." *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, ¶ 29 (2d Dist.); see *King* at 462 ("[W]arrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement.").

{¶ 20} "An urgent need to prevent evidence from being lost or destroyed may constitute an exigent circumstance, particularly where drugs are involved." *State v. Johnson*, 187 Ohio App.3d 322, 2010-Ohio-1790, 931 N.E.2d 1162, ¶ 14 (2d Dist.). "[A] warrantless entry to prevent the destruction of evidence is justified if the government demonstrates: '(1) a reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order.' " *State v. Enyart*, 10th Dist. Franklin Nos. 08AP-184 & 08AP-318, 2010-Ohio-5623, ¶ 21, quoting *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir.2000); *State v. Striks*, 2015-Ohio-1401, 31 N.E.3d 208, ¶ 32 (2d Dist.). In determining whether an exigent circumstance exists, courts employ "an objective test that looks at the totality of the circumstances confronting the police officers at the time of the entry." *Striks* at ¶ 32.

{¶ 21} We have cautioned that a police officer's observation of drugs and/or drug paraphernalia does not necessarily create an exigent circumstance, justifying the officer's entry into a home. *Goode* at ¶ 17. We stated:

[T]he mere existence of a "felony in progress" does not justify the warrantless entry; not every felony demands urgent police entry into a home. For example, an officer's observation that a home contains marijuana may create probable cause that a felony is in progress, but it might not necessarily create an urgent need to enter the home without a search or arrest warrant. *State v. Alihassan*, 10th Dist. Franklin No. 11AP-578, 2012-Ohio-825, ¶ 23 (the observance of marijuana and a grinder within a residence, alone, did not justify the police officer's warrantless entry). *See also, e.g., Horton v. California*, 496 U.S. 128, 137, fn.7, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Coolidge v. New Hampshire*, 403 U.S. 443, 468, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Morgan*, 743 F.2d 1158, 1167 (6th Cir.1984) (warrantless entry into a private home is not justified by plain view doctrine "merely because an item of contraband has become visible to those outside"). A warrantless entry due to a felony in progress is only permitted where the particular circumstances of the felony demonstrate the existence of an exigent or emergency circumstance.

*Goode* at ¶ 17.

{¶ 22} The plain view exception to the warrant requirement applies in situations where (1) the original intrusion by which the police viewed the item was lawful; (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent. *State v. Williams*, 55 Ohio St.2d 82, 85, 377 N.E.2d 1013 (1978), citing *Coolidge v. New Hampshire*, 403 U.S. 443, 446, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

{¶ 23} Here, the CPRT officers approached Deborah's apartment on the morning of November 4. Officer Humphrey testified that they went there "somewhere around 9:00." Although there were no lights on in the apartment and window coverings were closed, the sun had risen, and Officer Savage testified that "sunlight was out." On redirect examination, Officer Savage testified that, when Harris opened the door, sunlight went into the apartment and that he (Savage) was able to see into the apartment from that sunlight.

{¶ 24} Both Officers Savage and Humphrey testified that, after Harris opened the front door, they observed drug paraphernalia on a glass kitchen table right behind Harris. Officer Savage testified that, when Harris opened the front door completely, he (Savage) "could clearly see" a couple of razor blades, a couple of digital scales, credit cards, a box of sandwich baggies, and heroin residue on the table located behind Harris. Savage stated that he recognized the heroin residue from his "training and experience as a policeman" and that he had been involved in "numerous" arrests involving drugs. Officer Humphrey similarly testified that, when Harris opened the door most of the way, he could see "a table a few feet from the opening of the door. And I could see some drug paraphernalia on the table right in front of us." Humphrey elaborated that the items were digital scales with some brown residue on them, razor blades, credit cards, some baggies, and a few gelatin capsules, which he stated were all common in the packaging of heroin for sale.

{¶ 25} Officer Savage stated that he stepped inside to prevent Harris from grabbing any of the items on the table. Officer Humphrey testified that he entered "in order to secure the evidence that we could see there on the table."

{¶ 26} In the light of the officers' testimony, which the trial court credited, the trial court reasonably concluded that, after Harris opened the front door to the apartment, the officers were able to see the drug paraphernalia on the glass kitchen table behind Harris from their vantage point outside the apartment. Their testimony also established that the officers immediately recognized the items on the table as drug paraphernalia.

{¶ 27} Based on the totality of the circumstances, as found by the trial court, the officers were entitled to enter the apartment in order to prevent the destruction of evidence, namely drugs and drug paraphernalia. From their view outside the front door, the officers could see that various items of drug paraphernalia were near the front door and within Harris's reach. Although the officers could not see all of the individuals from outside the apartment, they were aware of at least two individuals inside – Harris and his sister. The officers reasonably concluded that their immediately entry into the home was necessary to avoid the destruction of evidence.

{¶ 28} In addition, the trial court did not err in concluding that Officer Humphrey was permitted to conduct a protective sweep of the apartment, particularly the bedroom.

{¶ 29} "A protective sweep is a reasonable exception to the Fourth Amendment's warrant requirement." *State v. Mathews*, 2d Dist. Montgomery No. 26326, 2015-Ohio-1047, ¶ 10, citing *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). A protective sweep, however, is not a full search of the premises. *Id.* It is only a "cursory inspection of those areas where a person who possesses a threat of danger to the police may be found." *State v. Young*, 2d Dist. Montgomery No. 24537, 2011-Ohio-4875, ¶ 17.

{¶ 30} A protective sweep is permitted when " 'articulable facts which, taken

together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the * * * scene.' " *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, ¶ 36 (2d Dist.), quoting *Buie*, 494 U.S. at 334, 110 S.Ct. 1093. If contraband is found during a protective sweep, the plain view doctrine allows an officer to seize it, without a warrant. *Mathews* at ¶ 14.

{¶ 31} Once Officers Savage and Humphrey stepped inside Deborah's apartment, they observed a total of four individuals. At that time, Darlisa walked quickly from the living room toward the back bedroom and bathroom. The officers did not know if Darlisa intended to destroy evidence, obtain a weapon, or do something else. The trial court found that Darlisa did not comply with the officers' orders to stop. When Officer Humphrey stopped Darlisa in the hallway and escorted her back to the living room, he could not see inside the entire back bedroom, and did not know if anyone else was present in the apartment. Based on their prior experience that firearms are often found where drugs are found, the officers also had reasonable concerns that a firearm might be present in the apartment. For the officers' safety, Officer Humphrey was permitted to conduct a protective sweep to ensure that no other individual, who might pose a danger to the officers, was present in the apartment. Based on the officer's testimony, the firearm and heroin were in plain view on the dresser.[1]

---

[1] In his motion to suppress, Harris recognized that "two prescription bottles and an Ohio Driver's License belonging to the Defendant Darren Harris" were also on the dresser, but there was minimal evidence at the suppression hearing about those items and how they were collected. Regardless, Harris did not argue in his motion to suppress or on appeal that these additional items were improperly seized under the plain view doctrine. Harris's argument on appeal is that "there was no need to do a protective sweep."

{¶ 32} Harris's first assignment of error is overruled.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 33} In his third assignment of error, Harris claims that the State failed to present sufficient evidence connecting him to the firearm and that his conviction for having a weapon while under disability was against the manifest weight of the evidence. Harris's brief does not address his conviction for possession of heroin.

{¶ 34} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 35} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 36} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 37} Six witnesses testified for the State at trial; Harris did not offer any witnesses. The State's evidence established the following facts.

{¶ 38} At approximately 9:00 a.m. on November 4, 2014, four CPRT officers went to a small one-bedroom apartment on Germantown Street to investigate a complaint that drugs were being sold out of an apartment belonging to Deborah; a Sherri Harris was also named in the complaint. Officers Savage and Humphrey went to the front door; the other officers went to the back of the apartment. When Harris answered the front door, Officers Savage and Humphrey saw drug paraphernalia on a table behind him. The officers entered the apartment. Four individuals were present inside – Harris, Deborah, Darlisa, and Ron Williams.

{¶ 39} When the officers entered the apartment, Darlisa "made a dash" toward the back of the apartment and did not stop when the officers asked her to. For officer safety, Officer Humphrey followed Darlisa down a hallway and brought her back to the living room. When Officer Humphrey returned, he informed Officer Savage that he had seen

a handgun and what he believed to be heroin on a dresser in the bedroom, which was down the hall. Officer Humphrey took Officer Savage to the room and showed Savage what he (Humphrey) observed.

{¶ 40} The officers collected several items found on top of the dresser in the bedroom. One item was a loaded silver and black handgun, which the parties stipulated was examined by the Miami Valley Regional Crime Lab ("MVRCL"), found to be in good working order, test fired, and found to be operable. The officers collected two prescription bottles of medication that were prescribed to a Darren Harris; no other bottles of medication were on the dresser. Officer Savage testified that approximately 3.8 grams of suspected heroin was collected from the dresser; a forensic chemist from MVRCL subsequently tested the substance and determined that it was 2.70 grams of heroin, plus or minus .02 grams. Finally, the officers collected an Ohio driver's license for Darren Harris from the dresser. (The officers also seized a driver's license for Darryl Harris, who Officer Savage believed was Darren Harris's brother, which was found on Darren Harris's person.)

{¶ 41} Officer Humphrey testified that the bedroom contained a bed, and there was men's and women's clothes throughout the bedroom. In addition to the seized items, there was a bottle of liquor, some food, a photograph, and some other items on the dresser. The photograph looked similar to Harris.

{¶ 42} When asked if the officers were able to determine through their investigation who lived at the apartment, Savage responded that the "only individual that we could prove through records that actually used that as his address was Mr. Darren Harris." Deborah had told the officers that it was her apartment.

{¶ 43} The officers did not find any drugs or firearms on Harris's person. When Harris answered the door, he had been wearing sweatpants; he was not wearing a shirt or shoes. Harris did not go into the bedroom while the officers were present. Harris never indicated that the drugs and firearm found in the bedroom were his.

{¶ 44} Officer Humphrey testified that he placed Harris under arrest. Humphrey explained that he had determined, at that point, that the bedroom was Harris's bedroom based on the items found in that room. Humphrey testified that, in addition to items that appeared to belong to Harris, the bedroom also contained items belonging to Darlisa, including her driver's license, which was found on the bed.

{¶ 45} The parties stipulated that Harris had a prior conviction in 2002 for rape, a first-degree felony, in Montgomery County. Detective Robert Shumaker of the Sheriff's Office testified that Harris registers his address with the Sheriff's Office and that, as of November 4, 2014, Harris registered the Germantown Street apartment as his address. That address was verified by the Sheriff's Office on October 10, 2014, when Harris was located at that apartment.

{¶ 46} Emily Draper of the Miami Valley Regional Crime Lab swabbed the firearm for DNA. She obtained a partial DNA profile, which was insufficient for "inclusionary purposes," meaning that there was so little DNA that she could not say who had touched it. Draper compared the sample to a sample from Harris, and Draper was able to exclude Harris as the source of the DNA on the gun. Draper was not given DNA samples from any other individuals for comparison.

{¶ 47} Harris was indicted of having weapons under disability, in violation of R.C. 2923.13(A)(2), which prohibits a person from knowingly acquiring, *having*, carrying, or

using any firearm or dangerous ordnance, if he has been convicted of any felony offense of violence. (Emphasis added.) Harris does not contest that he has a prior conviction that renders him unable to lawfully possess a firearm.

{¶ 48} Harris argues, in essence, that the State presented insufficient evidence that he had possession of the handgun and that the manifest weight of the evidence created reasonable doubt that he constructively possessed the handgun.

> "In order to 'have' a firearm, one must either actually or constructively possess it." Actual possession requires ownership and/or physical control. Constructive possession can be established by the fact that an individual had access to the gun and the ability to control its use.

*State v. Fleming*, 2d Dist. Clark No. 2014-CA-136, 2015-Ohio-5382, ¶ 26.

{¶ 49} More than one person may be found to have joint constructive possession of an item. *State v. Cole*, 2d Dist. Montgomery No. 26576, 2015-Ohio-5295, ¶ 34; *see also State v. Williams*, 4th Dist. Scioto No. 11CA3408, 2012-Ohio-4693, ¶ 38; *State v. Cooper*, 3d Dist. Marion No. 9-06-49, 2007-Ohio-4937, ¶ 25 ("two or more persons may have joint constructive possession of a particular item"). The critical issue is whether the person is conscious of the presence of the object and is able to exercise dominion and control over that item, even if it is not within his or her immediate physical possession. *E.g.*, *State v. Lam*, 2015-Ohio-4293, 46 N.E.3d 138, ¶ 41 (2d Dist.).

{¶ 50} There was no evidence at trial that Harris had actual possession of the firearm. Rather, the State's case was based on constructive possession. In determining whether a person constructively possessed an item, we examine the totality of the relevant facts and circumstances. "The State may prove constructive possession

solely through circumstantial evidence. Circumstantial evidence and direct evidence have the same probative value." (Citations omitted.) *State v. Peterson*, 2d Dist. Champaign No. 2014-CA-1, 2015-Ohio-789, ¶ 20.

{¶ 51} Upon review of the evidence, we find that Harris's conviction for having a weapon while under disability was based on sufficient evidence and was not against the manifest weight of the evidence. The charge was based on the officers' recovery of a handgun at the Germantown Street apartment, a small one-bedroom unit. Although Deborah identified herself as the renter of the apartment, Harris had listed the apartment as his residence, a fact that was confirmed by the Sheriff's Office. Harris answered the door when the CPRT officers knocked on November 4, 2014.

{¶ 52} The gun was located on the dresser in the apartment's bedroom, and the State presented evidence indicating that the bedroom was used by Harris. Harris's driver's license was located on the dresser, along with a photograph of him and two prescription bottles with his name. Both men's and women's clothing were found in the bedroom, and items that belonged to Darlisa, Harris' girlfriend, were also found in the bedroom, including Darlisa's driver's license. The firearm was located on the dresser with the personal items belonging to Harris, including Harris's medication and driver's license. And, while there was evidence that another person (Darlisa) also used the bedroom and there was no evidence that access to the bedroom was restricted, the possibility that another person may have also constructively possessed the gun did not preclude a finding that Harris did, as well. Based on the totality of the circumstances, the jury could have reasonably concluded that Harris knew of and was able to exercise dominion and control over the firearm found in the bedroom. *See State v. Breneman*, 2d

Dist. Champaign No. 2013-CA-27, 2015-Ohio-4783, ¶ 41 (jury could have reasonably concluded that defendant constructively possessed razor blade with cocaine found on the television table in his bedroom).

{¶ 53} Harris emphasizes that DNA evidence failed to connect him to the gun and, in fact, established that the gun was handled by someone else. Harris argues that the evidence thus demonstrated that he did not have exclusive possession of the firearm, and he claims that he had only a 25 percent probability of having ownership and possession of the weapon, given that three other individuals were in the apartment on the morning of November 4.

{¶ 54} The presence of DNA from another person on the handgun strongly suggested that another person had handled the weapon at some point. However, the lack of Harris's DNA on the handgun did not require a conclusion that Harris did not knowingly "have" the firearm when it was found by the police, particularly when the gun was located in what appeared to be his bedroom alongside his driver's license and prescription medication. *See State v. Barber*, 10th Dist. Franklin No. 14AP-557, 2015-Ohio-2653, ¶ 21. Based on the totality of the evidence, we cannot conclude that the jury lost its way when it convicted Harris of having a weapon while under disability.[2]

{¶ 55} Harris's third assignment of error is overruled.

### III. Ineffective Assistance of Counsel

{¶ 56} In his second assignment of error, Harris claims that his counsel acted deficiently by failing to call any witnesses at trial. Harris notes that his sister testified at

---

[2] Although Harris did not address his possession of heroin conviction in his brief, the same analysis supports a conclusion that he possessed the heroin found on the bedroom dresser.

the suppression hearing that she was asleep in her bedroom, with the bedroom door closed, when the police arrived at her apartment. Harris argues that the jury could have determined, based on that information, that he did not "possess" the gun found in the bedroom.

{¶ 57} To establish ineffective assistance of counsel, Harris must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of her trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 58.

{¶ 58} At the suppression hearing, Deborah testified that she resided at the Germantown Street apartment and that the bedroom was hers. She stated that she "was in my bedroom," with the door closed, when the officers knocked on November 4. When asked what was in her bedroom, she responded, "My bed, my dresser, and my fridge was." Deborah testified that she came out of her bedroom and walked into the living room before the officers entered the apartment.

**{¶ 59}** Had Deborah testified to this effect at trial, her testimony may have rebutted the State's circumstantial evidence that the bedroom was Harris's. However, the record does not reflect how she would have testified if she were asked about specific items on the dresser, including Harris's identification and medication, the handgun and the heroin. It is possible that defense counsel was privy to additional information and that counsel reasonably concluded that, on the whole, Deborah's testimony would be more damaging than helpful. With the limited information before us, defense counsel may have employed a reasonable trial strategy when he elected not to call Deborah as a witness. We will not second-guess debatable trial strategy.

**{¶ 60}** We further note that, although the record does not reflect the reason for defense counsel's decision not to call Deborah, counsel did inform the trial court and the State, prior to jury selection, that he was going to release the witnesses on his witness list (Deborah and Darlisa) from their subpoenas, and defense counsel asked the court to allow those individuals to sit in the courtroom during the trial. The trial court responded:

> Okay. Now I just want to make sure that Mr. Harris understands that if that happens, and those individuals sit through the trial, I'm not going to allow them to take the witness stand in his defense case. And so, I just want that to be absolutely clear that I'll allow those individuals to sit through the trial and observe all of our proceedings. It's an open and public trial. But if they -- those two individual sit there and watch the trial, they absolutely will not be allowed by this court to then take the witness stand, because they will have had the unfair advantage of listening to what everybody else has had to say.

Defense counsel conferred with Harris, and Harris indicated to the court that he understood. Thus, the record indicates that, immediately prior to trial, Harris was aware that Deborah would not be called as a witness, that he had conferred with his attorney about that matter, and that he voiced no concerns on the record.

{¶ 61} With the record before us, we cannot conclude that defense counsel acted deficiently by failing to call any witnesses at trial. Harris's second assignment of error is overruled.

## IV. Conclusion

{¶ 62} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

DONOVAN, J. and FAIN, J., concur.

Copies mailed to:

Ann M. Graber
Enrique G. Rivera-Cerezo
Hon. Barbara P. Gorman